Ismene M. KALARIS, Administrative Appeals Judge

v.

Raymond J. DONOVAN, Secretary of Labor, et al., Appellants.

Julius MILLER, Administrative Appeals Judge

v.

Raymond J. DONOVAN, Secretary of Labor, et al., Appellants.

Ismene M. KALARIS, Administrative Appeals Judge, Appellant,

v.

Raymond J. DONOVAN, Secretary of Labor, et al.

Julius MILLER, Administrative Appeals Judge, Appellant,

v.

Raymond J. DONOVAN, Secretary of Labor, et al.

Nos. 82–1631, 82–1633, 82–1707 and 82–1694.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 16, 1982.

Decided Jan. 4, 1983.

Richard K. Willard, Deputy Asst. Atty. Gen., with whom Stanley S. Harris, U.S. Atty., and Robert E. Kopp and Alfred R. Mollin, Attys., Dept. of Justice, Washington, D.C., were on the brief, for Secretary of Labor Donovan, et al., appellants in Nos. 82–1631 and 82–1633 and cross-appellees in Nos. 82–1707 and 82–1694. Anthony J. Steinmeyer, Atty., Dept. of Justice, Washington, D.C., entered an appearance for Secretary Donovan, et al.

Theodore Voorhees, Jr., with whom William H. Allen and Douglas S. Abel, Washington, D.C., were on the brief, for Kalaris and Miller, appellees in Nos. 82–1631 and 82–1633 and cross-appellants in Nos. 82–1707 and 82–1694.

Thomas C. Fitzhugh, III and Stephen M. Vaughan, Houston, Tex., filed a pro se brief as amici curiae in support of appellees/cross-appellants Kalaris and Miller.

Mark Schaffer, Washington, D.C., was on the brief for amicus curiae Maritime Claimant's Attorneys Association in support of appellees/cross-appellants Kalaris and Miller.

Before WRIGHT, TAMM and WALD, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

The Department of Labor's Benefits Review Board hears appeals from decisions of Administrative Law Judges (ALJs) concerning claims for federal workers' compensation brought pursuant to the Longshoremen's and Harbor Workers' Compensation Act of 1927, 44 Stat. 1424, *as amended,* 33 U.S.C. § 901 *et seq.* (1976 & Supp. IV 1980). The Act expressly authorizes the Secretary of Labor to appoint the three members of the Board, 33 U.S.C. § 921(b)(1) (1976), but is silent concerning the members' tenure and the terms of their removal. Contemporaneously with creation of the Board, the Secretary promulgated regulations providing that Board members would serve indefinite terms at his discretion. 20 C.F.R. § 801.201(d) (1982). This regulation remained unchallenged for almost a decade.

In May of 1982 the Secretary attempted to remove two members of the Board without specifying his reasons or providing them with a hearing.[1] The removed members brought suit in the District Court to enjoin the Secretary from removing them. The District Court awarded the re-

---

1. The removed Board members are Ismene M. Kalaris and Julius Miller. They are appellees in Nos. 82–1631 and 82–1633, and cross-appellants in Nos. 82–1707 and 82–1694.

quested injunctions. Although it found that the Board was not an Article III court and therefore that the Board members were not entitled to Article III's guarantee of life tenure, the District Court held that Board members could not be removed without a showing of cause because Congress intended for the Board to have an independent and quasi-judicial status. We agree that the Board is not an Article III court. But because we find that Congress did not intend to make the Board independent of the Secretary, we reverse the District Court's judgment enjoining the Board members' removal. We hold to the longstanding rule that in the face of congressional silence all inferior officers of the United States serve at the discretion of their appointing officer.

## I. BACKGROUND

█ The Longshoremen's and Harbor Workers' Compensation Act provides workers' compensation for certain workers not covered by state workers' compensation schemes.[2] The Act makes employers liable up to a statutory maximum for job-related injuries and deaths without regard to fault. 33 U.S.C. § 904 (1976). If a dispute regarding a claim arises, a deputy commissioner of the Department of Labor will seek to resolve it through informal means.[3] 20 C.F.R. § 701.311–701.319 (1982). If informal resolution is not possible, the deputy commissioner will transfer the dispute to an ALJ. 33 U.S.C. § 919(d) (1976 & Supp. IV 1980). The ALJ will conduct a formal hearing according to the Administrative Procedure Act, 5 U.S.C. §§ 500–576 (1976 & Supp. V 1981),[4] and has the power to approve settlements of disability,[5] to approve withdrawal of claims,[6] and to issue compensation orders.[7] Interested parties may file appeals from the ALJ's decision with the Board,[8] and from the Board with the appropriate Court of Appeals.[9] 33 U.S.C. §§ 921(b) & (c) (1976 & Supp. IV 1980).

Prior to the Act's amendment in 1972, deputy commissioners adjudicated disputed claims—conducting hearings and receiving

**2.** For a description of the modern version of the federal workers' compensation system, *see generally* Doak & Hecker, *Is it a New Ball Game? —The 1972 Amendments to the Longshoremen's and Harbor Workers' Act,* 11 FORUM 544 (1976); Gorman, *The Longshoremen's Act After the 1972 Amendments,* PRAC. LAW., May 1974, at 13; Hazen & Toriello, *Longshoremen's Personal Injury Actions Under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act,* 53 ST. JOHNS L.REV. 1 (1978).

**3.** Deputy commissioners are regional officials charged with the day-to-day administration of the Act. 33 U.S.C. §§ 939, 940 (1976); 20 C.F.R. §§ 701.201–701.203 (1982).

**4.** 33 U.S.C. § 919(d) (1976 & Supp. IV 1980).

**5.** *Clefstad v. Perini N. River Ass'n,* 9 Benefits Review Board Service (BRBS) 217 (1978).

**6.** *Graham & Ingalls Shipbuilding/Litton Systems, Inc. v. Director,* OWCP, 9 BRBS 155 (1978). Approval of a withdrawal claim will be made if it is "for a proper purpose and in the claimant's best interest." 20 C.F.R. § 702.216 (1982).

**7.** 20 C.F.R. § 702.348 (1982).

**8.** Interested parties normally include the employer and the claimant. But the Director of the Office of Workers' Compensation Programs (OWCP) is, by regulation, also a party in interest and may participate in any formal hearing. 20 C.F.R. § 802.410(b) (1982). The Director is thereby entitled to seek review of Board decisions in the courts, *see Director, OWCP v. Boughman,* 545 F.2d 210 (D.C.Cir.1976); *see also Director, OWCP v. Eastern Coal Corp.,* 561 F.2d 632, 641–649 (6th Cir.1977), to "ensure proper and consistent administration of the Act," *Shahady v. Atlas Tile & Marble Co.,* 673 F.2d 479, 483 (D.C.Cir.1982) (*per curiam*), and to administer the special fund created for the relief of injured workers whose employers have defaulted on compensation payments or become insolvent. *See, e.g., Erickson v. Crowley Maritime Corp.,* 14 BRBS 218 (1981).

**9.** The Board can be a party to an appeal from one of its own decisions, *see* 20 C.F.R. § 801.-402 (1982), but it does not *have* to be. *McCord v. Benefits Review Board,* 514 F.2d 198 (D.C.Cir.1975). The Board does not have to be a party to the appeal because the employer and the employee are sufficiently adverse parties, because the Court of Appeals has the plenary power necessary to do justice, and because the statute does not require the Board to be a party to court proceedings. *Id.; see also Oil, Chemical & Atomic Wkrs Int'l Union v. OSHRC,* 671 F.2d 643, 652 n. 12 (D.C.Cir.1982) (*per curiam*).

evidence, 44 STAT. 1435, as well as administering the Act. Their initial decisions were then reviewable by the District Courts, with further resort, if desired, to the Courts of Appeals.[10] The 1972 amendments completely overhauled the procedures necessary to obtain benefits under the Act.[11] The amendments left the initial informal resolution of claims to the deputy commissioners,[12] but transferred the formal adjudication of claims to the ALJs and the Board.[13] The amendments thus completely eliminated the role of the District Courts in the claims process, though, of course, resort to the Courts of Appeals was maintained.

 Under the new procedural scheme, the ALJs make formal findings of fact and draw conclusions of law.[14] The Board, acting as a "quasi-judicial" internal appellate review mechanism,[15] then considers the record developed before the ALJs and determines if their decisions are supported by substantial evidence and are in accordance with law.[16] 33 U.S.C. § 921(b)(3) (1976); see 20 C.F.R. § 802.301 (1982). The Board thus performs a review function identical to that which the District Courts performed prior to the 1972 amendments.[17] The claims decisions, once considered by the Board, can be reviewed again by the Courts of Appeals, on petition, to determine if they are supported by substantial evidence and if they are in accordance with law.[18] 33 U.S.C. § 921(c) (1976). See Nat'l Steel &

10. The District Courts would review the deputy commissioners' decisions to see if the findings of fact were supported by "substantial evidence" and to determine, de novo, if the conclusions of law were "in accordance with law." 44 STAT. 1436; see also O'Leary v. Brown-Pacific-Maxon, Inc., 340 U.S. 504, 508, 71 S.Ct. 470, 472, 95 L.Ed. 483 (1951).

11. 86 STAT. 1261. For a thorough review of the revised claims procedures under the 1972 amendments, see Tucker, Coverage and Procedure Under the Longshoremen's and Harbor Workers' Compensation Act Subsequent to the 1972 Amendments, 55 TUL.L.REV. 1056, 1082–1088 (1981).

12. See note 3 supra and accompanying text.

13. The Senate Report to the 1972 amendments complained that the old Act had "suffered by virtue of the failure to keep separate the functions of administering the program and sitting in judgment on the hearings." S.Rep. No. 92–1125, 92d Cong., 2d Sess. 13–14 (1972). Congress therefore reorganized the deputy commissioners' duties, dividing them among the deputy commissioners, the ALJs, and the Board.

In addition to claims under this Act, the Board hears appeals arising from other federal workers' compensation statutes. See, e.g., Federal Mine Safety and Health Act of 1972, 30 U.S.C. § 932 (1976 & Supp. IV 1980); Defense Base Act, 42 U.S.C. § 1651 et seq. (1976 & Supp. IV 1980); District of Columbia Workers' Compensation Act, 36 D.C.Code § 501 et seq. (1981); Outer Continental Oil Shelf Lands Act, 43 U.S.C. § 1331 et seq. (1976 & Supp. IV 1980); Nonappropriated Fund Instrumentalities Act, 5 U.S.C. § 8171 et seq. (1976 & Supp. V 1981).

14. 33 U.S.C. § 919(d) (1976 & Supp. IV 1980).

15. The Department of Labor's own regulations provide that "[a]s prescribed by statute, the functions of the Benefits Review Board are quasi-judicial in nature * * *." 20 C.F.R. § 801.103 (1982). But the statute also placed the Board within the Department of Labor, and left to the Secretary the task of adequately separating the administrative and adjudicative functions. 33 U.S.C. § 939 (1976). Pursuant to this statutory duty, the Secretary placed the Board within the Office of the Under Secretary of Labor. The Secretary authorized the Under Secretary to promulgate rules and regulations "appropriate for effective operation of the Benefits Review Board as an independent quasi-judicial body in accordance with the provisions of the statute," 20 C.F.R. § 801.104 (1982), and to provide the Board with funds, supplies, and equipment, id. The Secretary also authorized the Solicitor of Labor to appoint attorneys to represent the Board in court. Id.

16. The Board will not hear issues which were not raised before the ALJ and which were not specified in the petition. Moore v. Paycor, Inc., 11 BRBS 483, 492–493 (1979). Nor can the Board hear new evidence. 20 C.F.R. § 802.301 (1982).

17. See, e.g., Nacirema Operating Co. v. Benefits Review Board, 538 F.2d 73, 75 (3d Cir.1976). It is important to understand, however, that the District Courts, like the Board now, did not perform a de novo factual review, did not consider new evidence, and did not reweigh the evidence. See note 10 supra.

18. The appellate courts' function did not change when the initial review function was shifted from the District Courts to the Board. See Duluth, Missabe & Iron Range R. Co. v. Dep't of Labor, 553 F.2d 1144, 1147 (8th Cir. 1977). In other words, the standards for re-

*Shipbuilding Co. v. Bonner,* 600 F.2d 1288, 1292 (9th Cir.1979); *Presley v. Tinsley Maintenance Serv.,* 529 F.2d 433, 436 (5th Cir.1976). Thus the Board screens cases, administers Department policy, and apparently reduces the number of cases that will be taken to the Courts of Appeals; its review function, a replacement for the District Court's review, is duplicated in those cases that actually do advance to the Courts of Appeals.[19]

▮ The Board's members are appointed by the Secretary under the specific mandate of the Act. 33 U.S.C. § 921(b)(1) (1976).[20] Julius Miller was appointed to the Board in 1974, and Ismene Kalaris was appointed in 1978. They served on the Board until April 30, 1982, when the Under Secretary of Labor informed them that they were to be removed from their positions on the Board, effective May 31, 1982. No reasons were given for the removals.[21] No member of the Board had ever previously been involuntarily removed from office.[22]

In May 1982 Miller and Kalaris brought these actions for declaratory and injunctive relief.[23] They argued that the Board was an Article III court and that they, as judges on an Article III court, were entitled to life tenure and could not be removed during

good behavior. Alternatively the complaint asserted that Congress intended in the Act to create a Board which was independent of the Secretary and whose members could therefore not be removed absent a showing of "cause."

The District Court rejected the removed members' claim that the Board was an Article III court and that they were thus entitled to life tenure. JA 144–145. But to avoid casting the constitutionality of the statute into doubt, it accepted the Board members' argument that Congress, despite its silence, meant to require the Secretary to show "cause" before removing a member from this "independent and quasi-judicial" tribunal. JA 143–144. The District Court concluded that 33 U.S.C. § 921(b) (1976), the provision authorizing the Secretary to appoint Board members, would be unconstitutional if it were construed to permit the Secretary "to influence claims decisions * * * through replacement of the entire Board." JA 142. Citing numerous admonishments in two Supreme Court decisions, *Humphrey's Executor v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), and *Wiener v. United States,* 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958),[24] the Dis-

view of questions of fact and law remained the same.

19. The Board must enlist the aid of the District Courts, however, to enforce its orders. 33 U.S.C. § 921(d) (1976).

20. Board members are inferior officers of the United States. *See* U.S. Const. Art. II, § 2. For the text of 33 U.S.C. § 921(b)(1), *see* note 51 *infra.*

21. The record does contain several possible explanations, however. The Under Secretary allegedly indicated some concern with the Board's "volume of work." Joint Appendix (JA) 46. But the record does not indicate what the exact concern involved. *Cf.* JA 103 (Board's production exceeding targeted levels). The removed members also claimed that the new Chief Judge made their removal a condition of his acceptance of the chief judgeship. JA 49–51. Finally, there is some indication that the Secretary simply wanted to replace these members with appointees of his own. JA 123–124. None of these explanations was substantiated.

22. Brief for appellees/cross-appellants at 8–9.

23. The removed members protest their unexplained removals. They were, however, only transferred to other positions in the Department of Labor, at like grade and pay. Brief for appellants/cross-appellees at 26 n.25.

24. JA 142–144. For example, the District Court stated:

Congress certainly did not intend to permit the Secretary to pack this independent and quasi-judicial tribunal, "for it is quite evident that one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will. * * *

JA 143 (*quoting Humphrey's Executor v. United States,* 295 U.S. 602, 629, 55 S.Ct. 869, 874, 79 L.Ed. 1611 (1935)). The District Court believed that the

nature of the Board's duties requires independence from the Secretary. The Board is analogous to the positions of Federal Trade Commissioner in *Humphrey's Executor v. United States, supra,* and War Claims Com-

trict Court found that the statute barred the Secretary from removing the Board members from their positions without showing cause and providing an opportunity for hearing.[25] JA 145–146. Consequently, the District Court granted the removed members' motion for summary judgment and enjoined their removal from the Board. The Secretary appeals this decision, and the removed members cross-appeal the District Court's denial of the Board's Article III status.

## II. THE BOARD'S ARTICLE III STATUS

 Article III, Section 1 of the federal Constitution provides:

The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

U.S. Const. Art. III, § 1. This section requires the Congress to provide certain protections—specifically, life tenure and guaranty against salary diminution—for all judges on Article III courts.[26] The District Court held that the Board was not an Article III court, however, because Congress "expresses clearly which courts enjoy Article III status * * * [and] Congress has not done so here." JA 144–145. The removed members argue that it is not the *label* that Congress uses that determines which adjudicative bodies are Article III courts, but rather the *powers* that Congress vests in them, and the *powers* that Congress vested in the Board, they contend, were those of an Article III court.[27]

missioner in *Wiener v. United States, supra.*
* * *
JA 144.

25. Because the District Court found that Congress intended the Board to be independent of the Secretary, it did not decide whether Congress constitutionally could have assigned these functions to the Secretary himself. JA 144. It merely held that the statute gave Board members a "property" interest in their positions and a constitutional entitlement to notice and hearing. *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Perry v. Sinderman,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). This protection was constitutionally required because Congress had chosen to vest the adjudication of workers' compensation claims in a "quasi-judicial" body. JA 142.

26. These protections help ensure the independence of the judiciary from the political control of the Executive and Legislative Branches, and thereby help to promote public confidence in judicial determinations. *See* THE FEDERALIST No. 78 (A. Hamilton). The protections also help to attract well qualified persons to the federal bench and to promote judicial individualism. *See* Kaufman, *Chilling Judicial Independence,* 88 YALE L.J. 681, 713 (1979); *see generally* Krattenmaker, *Article III and Judicial Independence: Why the New Bankruptcy Courts are Unconstitutional,* 70 GEO.L.J. 297 (1981); Note, *Article III Limits on Article I Courts: The Constitutionality of the Bankruptcy Court and the 1979 Magistcy Act,* 80 COLUM.L.REV. 560 (1980).

27. The Secretary urges that the removed members do not have standing to raise the Article III issue. Reply brief for appellants/cross-appellees at 28–29. He notes that all a court is empowered to do is examine Congress' actual grants of judicial power and determine whether such grants are valid. *Id.* at 28. The courts cannot attempt to correct a statute's infirmity by creating Article III judges where Congress has not. Thus the Secretary contends that were the removed members' challenge to succeed, the *necessary* result would be abolition of their offices. *Id.* at 29. Since such relief arguably would not redress the removed members' asserted injuries, the Secretary concludes that the removed members do not have standing. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 469, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982) (claimant must show concrete injury, injury must be traceable to the challenged action, and the court must be able to redress the injury).

We think that Miller and Kalaris do have standing to assert the Article III claim. To begin with, it is a cardinal principle of statutory construction that a court will avoid casting constitutional doubt on a statute where "fairly possible." *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932). It is "fairly possible" to do so here because Congress was completely silent in the statute as to the Board's Article III status. If we find that Congress did not create an Article III court, then we have no constitutional problem. Similarly, if we find that Congress did in fact create an Article III court, then by finding an implied

The removed members are correct in pointing out that the District Court employed the wrong test for determining whether Congress has created an Article III court. While Justice Harlan did once suggest that the only way to tell an Article I court from an Article III court is to examine the "establishing legislation [to see if it] complies with the limitations of [Article III]" [28]—and this does come "dangerously close to saying that Article III courts are those with Article III judges," [29]—*all* of the opinions filed in the Court's latest Article III case, *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, —— U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598, (1982) [30] agree that it is not what Congress *says* but what powers Congress vests in the adjudicatory body that counts.[31] What the *Northern Pipeline* plurality, concurring, and dissenting opinions could not agree upon were the circumstances in which Congress could *constitutionally* vest certain traditional attributes of the judicial function in adjudicatory bodies whose judges do not have the benefits of life tenure and the guarantee against salary diminution.[32]

grant of life tenure in the congressional silence we can avoid the constitutional question. Thus simple rules of statutory construction would instruct us to construe the statute in a way that provides the removed members with standing. Moreover, under the Secretary's construction judges would never be able to sue for the life tenure or salary diminution guaranty provided for in Article III if Congress did not specifically include them in the statute, even if Congress *explicitly* established an Article III court. This would deprive judges of benefits that Congress intended to give and would make a mockery of standing doctrine. Finally, under the Secretary's construction only individual litigants— *e.g.,* employers or employees—would have standing to assert improper deprivation of an Article III judge on an Article III tribunal. Though individual litigants have been found to have standing, *see, e.g., Northern Pipeline Const. Co. v. Marathon Pipe Line Co.,* —— U.S. ——, ——, 102 S.Ct. 2858, 2863, 73 L.Ed.2d 598 (1982); *Swain v. Pressley,* 430 U.S. 372, 377, 97 S.Ct. 1224, 1227, 51 L.Ed.2d 411 (1977); *Palmore v. United States,* 411 U.S. 389, 394, 93 S.Ct. 1670, 1674, 36 L.Ed.2d 342 (1973), the tenure and salary guarantees were designed to benefit judges as well. *See* The Federalist No. 78 (A. Hamilton) 488–489 (Washington 1818). In sum, we find that the removed members have standing to litigate whether Congress made the Board an Article III court.

**28.** *Glidden Co. v. Zdanok,* 370 U.S. 530, 552, 82 S.Ct. 1459, 1473, 8 L.Ed.2d 671 (1962) (plurality opinion of Harlan, J.).

**29.** *Northern Pipeline Const. Co. v. Marathon Pipe Line Co., supra* note 27, —— U.S. at ——, 102 S.Ct. at 2893 (White, J., dissenting).

**30.** In *Northern Pipeline* the Court held that the Bankruptcy Reform Act of 1978, 28 U.S.C. § 1471(b)(1) (1976 ed., Supp. III), unconstitutionally granted to bankruptcy judges who lacked life tenure and protection against salary diminution jurisdiction over "all civil proceedings arising under title 11 [bankruptcy] or arising in or related to cases under title 11." These

bankruptcy judges were empowered to issue final judgments, to enforce their own monetary awards, to conduct all manner of civil proceedings that federal District Courts could conduct, including jury trials, and to exercise all these powers in disputes over liabilities between private citizens. But the bankruptcy judges were appointed only for 14-year terms and were subject to removal by the judicial council of the circuit in which they served on grounds of incompetence, neglect of duty, or disability. Their salaries were set by statute and were subject to adjustment. The Court was divided, with no majority opinion, but agreed that this was an unconstitutional infringement on Article III. Justice Brennan, writing for a plurality, concluded that Congress could not vest most, if not all, of the "essential attributes of the judicial power" in non-Article III judges. —— U.S. at ——, 102 S.Ct. at 2879. Justice Rehnquist, with whom Justice O'Connor concurred, concluded that Congress could not vest the power to adjudicate traditional state law claims in a federal, non-Article III judge. Justice White, writing for the dissenting Justices, would have upheld the Act as a proper balance of Article I and Article III interests.

**31.** The plurality and concurring opinions necessarily imply that it is not what Congress *says* that counts because the Bankruptcy Act explicitly said that bankruptcy judges were *not* Article III judges—they had specified terms and could be removed for various causes. But the plurality and concurrence concluded that Congress had nonetheless created something akin to an Article III court. Justice White's *ad hoc* balancing test, proposed in dissent, explicitly rejected congressional statement as the determining factor since his test would have left to the Court the responsibility for striking the final balance between the Article I and Article III interests. *See* —— U.S. at ——, 102 S.Ct. at 2893.

**32.** The immediate controversy in *Northern Pipeline* concerned certain state law claims.

■ The removed members argue that Congress' amendments to the Act in 1972 endowed the Board with Article III powers and the Board's members with Article III protections.[33] They point to five separate indicia of the Board's Article III status: (1) the Board adjudicates cases of "private rights"; (2) the Board exercises a judicial review function previously performed by the federal District Courts; (3) the Board applies the "substantial evidence" test when it reviews administrative law judge decisions; (4) the Board has jurisdiction over admiralty matters; and (5) the Board is free of agency oversight. Reply brief for appellees/cross-appellants at 3. But we do not think that these indicia—taken either alone or together—prove that Congress created an Article III court when it assigned the intermediate review of workers' compensation claims to the Board.

■ First, there can be no doubt that adjudication of workers' compensation claims involves "private rights." The Supreme Court so characterized such claims when it *approved* the constitutionality of the Act's original scheme, in which deputy commissioners, the subordinates of other Executive officials, rendered the initial de-

terminations. *See Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932). But the Court has never indicated that all *federally* created private rights must be adjudicated in Article III courts. *Northern Pipeline* effectively held that certain private state law claims, when adjudicated within the federal system, must be decided by Article III courts.[34] Even the plurality opinion, which would have gone farther than the Court's effective holding, approved the initial determination of "private rights" by non-Article III judges,[35] so long as the "essential attributes of the judicial power" were reserved in Article III courts.[36] Thus it is clear that Article III does not require Article III judges to perform every stage of adjudication where "private rights" are at stake.

■ Second, though the Board exercises a review function previously performed by the District Courts, this review function could also have been performed by a non-Article III court under the 1932 version of the Act. Under that version, the District Courts reviewed findings of fact to determine if they were supported by substantial evidence and legal conclusions to see if they

---

Both the plurality and concurring Justices agreed that such state law claims could not constitutionally be adjudicated within the federal system by non-Article III judges. *See —— U.S. at ——*, 102 S.Ct. at 2877 (plurality opinion); —— U.S. at ——, 102 S.Ct. at 2881 (concurring opinion). Because this was the sole ground upon which the concurring Justices relied, it was the effective basis of the decision. *See —— U.S. at —— n. 2, 102 S.Ct. at 2883 n. 2 (White, J., dissenting). But the Court reached no agreement concerning what limits Article III places on Congress' ability to create adjudicative institutions designed to carry out *federal* policy and law.

**33.** Commentators have differed over whether the Board performs judicial or administrative review. *Compare* Washington, *Benefits Review Board's New Appellate Process Under the Longshoremen's Act,* 11 Forum 686 (1976) (former Board chairman argues that Board should be treated like an Article III court, *with* Currie & Goodman, *Judicial Review of Federal Administrative Action: Quest for the Optimum Forum,* 75 Colum.L.Rev. 13 (1975) (describing Board as an administrative forum).

**34.** *See note 30 supra.*

**35.** —— U.S. at ——, 102 S.Ct. at 2873. The *Northern Pipeline* plurality emphasized that Congress' power to assign limited adjudicatory functions to non-Article III judges is in no sense an exception to Article III, and that Article III therefore did not specify any particular limitations on Congress' ability to do so. *Id.* —— U.S. at —— n. 29, 102 S.Ct. at 2874 n. 29. But the plurality emphasized that Congress' adjustment of the manner of adjudication must be sufficiently linked to its legislative power to define substantive rights. *Id.,* —— U.S. at —— ——, 102 S.Ct. at 2877–2880; *see also Atlas Roofing Co. v. OSHRC,* 430 U.S. 442, 450 n. 7, 97 S.Ct. 1261, 1266 n. 7, 51 L.Ed.2d 464 (1977). Broad delegations like those in *Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), which the plurality specifically reapproved, *see* —— U.S. at ——, 102 S.Ct. at 2878, were constitutionally acceptable so long as the "essential attributes of the judicial power" were reserved in an Article III court. *Id.*

**36.** —— U.S. at ——, 102 S.Ct. at 2877.

were in accordance with law.[37] Because courts could fully review the deputy commissioners' legal conclusions, delegating the initial determination did not "interfere with * * * the exercise by the court of its jurisdiction." *Crowell v. Benson, supra,* 285 U.S. at 49–50, 52 S.Ct. at 291–292. Moreover, because courts reviewed the factual findings to determine if they were supported by substantial evidence, the legislation did not improperly deprive Article III courts of access to the necessary facts.[38] This same scheme has been preserved in the 1972 version of the Act: the Courts of Appeals review legal decisions to determine if they are in accordance with law and review findings of fact to determine if they are supported by substantial evidence.[39] While the Board applies the same appellate standards, it is simply providing an *additional* level of review.[40] Article III requires only that the ultimate "judicial power" be reserved in the Article III courts; it does not require that all adjudicative bodies exercising the review "standards" that Article III courts exercise be constituted as Article III courts.[41] Thus the fact that the Board replaced the District Court in the new claims procedure scheme,[42] where more than "traditional" appellate review was maintained in the appellate courts,[43] does not make the Board an Article III court. For the same reasons, the fact that the Board conducts "substantial evidence" review does not so vest it with judicial powers that it must be considered an Article III court.[44]

37. *See* note 10 *supra.*

38. *Crowell v. Benson, supra* note 35, 285 U.S. at 49–61, 52 S.Ct. at 291–296. In *Northern Pipeline* both plurality and concurring Justices found this to be an important distinction between the bankruptcy courts, which were subject to only "clearly erroneous" review, and the deputy commissioners. *See* —— U.S. at —— n. 39, 102 S.Ct. at 2879 n. 39 (plurality opinion); —— U.S. at ——, 102 S.Ct. at 2880 (concurring opinion). The Justices were convinced that the degree of appellate review provided for in the bankruptcy context was inadequate since the factual nature of the case would have been shaped at the trial level and the appellate court restricted to considerations of law. *Id.* Thus both *Crowell* and *United States v. Raddatz,* 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980), were reapproved since those cases provided for appropriate judicial control of both factfinding and legal decisionmaking.

39. *See* note 18 *supra* and accompanying text.

40. *See* Currie & Goodman, *supra* note 33, 75 Colum.L.Rev. at 36 (change in judicial review provisions reflects "a congressional judgment that the added opportunity for *administrative* review made the district court review unnecessary and potentially exhausting") (emphasis added).

41. *Northern Pipeline* held that Congress could not constitutionally *remove* from an Article III court most, if not all, of "the essential attributes of the judicial power" and vest them in a non-Article III adjunct. *See* —— U.S. at ——, 102 S.Ct. at 2879 (plurality opinion); —— U.S. at ——, 102 S.Ct. at 2880 (concurring opinion). But it did not hold that an adjunct forum could not exercise some of those powers—like the review function—if they were also *preserved* in an Article III court, a court which freely and independently exercises the ultimate judicial power. Nothing in *Northern Pipeline* prohibits the replacement of a District Court with an adjunct, so long as the "essential attributes of the judicial power" are preserved in an Article III court.

42. It is true that in deciding that Congress created the Court of Customs Appeals under its Article I powers rather than under its Article III powers, the Supreme Court relied on, *inter alia,* the fact that functions of the Court of Customs Appeals had previously been exercised by the Secretary of the Treasury. *Ex Parte Bakelite Corp.,* 279 U.S. 438, 458–459, 49 S.Ct. 411, 416, 73 L.Ed. 789 (1929). But this was only one factor that the Court relied upon, and the Court ultimately concluded that the true test of the Court of Customs Appeals Article III status was the jurisdiction and power conferred upon it. *Id.* at 459, 49 S.Ct. at 416.

43. Traditionally, an appellate court reviews an inferior Article III court's factual findings according to the "clearly erroneous" standard of review. Fed.R.Civ.P. 52(a). *Northern Pipeline* concluded that the "clearly erroneous" test, by itself, did not allow an appellate court sufficient review over non-Article III adjuncts. *See* note 39 *supra.*

44. The removed members claim that "substantial evidence" review is the distinguishing feature of judicial as opposed to administrative appellate bodies, citing *Federal Radio Comm'n v. Nelson Brothers Bond & Mortgage Co.,* 289 U.S. 266, 276, 53 S.Ct. 627, 632, 77 L.Ed. 1166 (1933). But *Nelson Brothers* merely held that the Supreme Court had jurisdiction to review a Court of Appeals decision made under a "sub-

■ Third, though the Board's jurisdiction includes admiralty cases, and such cases do arise "under * * * the Laws of the United States" within the meaning of Article III, Section 2, the Supreme Court has already decided that non-Article III adjuncts can be constitutionally employed in admiralty and maritime cases. *Crowell v. Benson, supra.* The law is emphatically clear that when Congress creates a substantive federal right, it possesses substantial discretion to prescribe the manner in which that right may be adjudicated—including assigning to an adjunct some functions historically performed by judges. *Northern Pipeline, supra,* —— U.S. at ——, 102 S.Ct. at 2875. This is what Congress has done with the Board.

■ Fourth, even if the removed members are correct in asserting that the Board is free from oversight and review of the Executive Branch,[45] it does not follow that the Board is an Article III court and that Board members are Article III judges. Congress can rationally and constitutionally create an administrative framework in which the Executive has only a limited

form of control over the administrative appellate process. The test of an Article III court is not how much control the Executive has over an adjudicatory body, but whether an adjudicatory body has enough characteristics of an Article III court. Freedom from oversight is a protection afforded to Article III courts; it is not a test of their existence.

Finally, not only do these indicia not make out an Article III court, many of the other, more "essential attributes of the judicial power" expressly were not vested in the Board. The Board does not have the power of the subpoena or the power to punish anyone for contempt.[46] 33 U.S.C. § 927 (1976). The Board possesses only limited powers to issue compensation orders and it must resort to an appropriate District Court to have its orders enforced.[47] *Id.* §§ 921(b)(3), 921(d). The Board's narrow jurisdictional grant extends only "to claims of employees [under the Act]," and not to all potentially related matters.[48] *Id.* § 921(b)(3). It plays only a limited role in reviewing ALJ determinations and obviously does not exercise all of the jurisdiction usually conferred on District Courts.[49]

stantial evidence" review. 289 U.S. at 278, 53 S.Ct. at 633. Under then prevailing doctrine, *see Federal Radio Comm'n v. General Electric Co.,* 281 U.S. 464, 50 S.Ct. 389, 74 L.Ed. 969 (1930), the Court had held that it, as the Supreme Court, could not constitutionally be given final authority to make purely administrative decisions. *Nelson Brothers* simply stated, then, that a court supervising and revising agency findings is making administrative as opposed to judicial decisions and concluded that a court performing "substantial evidence" review is making sufficiently non-administrative decisions—"judicial judgments"—that the Supreme Court could constitutionally have jurisdiction. 289 U.S. at 278, 53 S.Ct. at 633. It nowhere stated that *all* tribunals performing substantial evidence review must be Article III courts. Indeed, this latter proposition is counter-intuitive and has no basis in law.

45. The litigants dispute whether the Board is free from substantive agency oversight or review. *Compare* brief for appellees/cross-appellants at 5–6; reply brief of appellees/cross-appellants at 5–7, *with* reply brief for appellants/cross-appellees at 11, 15–17. For purposes of this case, we need not resolve this dispute since we find that the Board is not an Article III court.

46. By contrast, the bankruptcy courts in *Northern Pipeline* had the power to issue any order, process, or judgment appropriate for enforcement of the bankruptcy laws and related matters. 11 U.S.C. § 105(a) (1976 ed., Supp. III). They exercised all ordinary power of District Courts, including the power to preside over trials, to issue declaratory judgments, and to issue writs of habeas corpus. —— U.S. at ——, 102 S.Ct. at 2879.

47. By contrast, the bankruptcy courts in *Northern Pipeline* could issue final judgments, which were binding and enforceable in the absence of an appeal. —— U.S. at ——, 102 S.Ct. at 2879.

48. By contrast, the bankruptcy courts in *Northern Pipeline* had subject matter jurisdiction encompassing not only traditional matters of bankruptcy, but also all "civil proceedings arising under title 11 or arising in *or related to* cases arising under title 11." 28 U.S.C. § 1471(b) (1976 ed., Supp. III) (emphasis added).

49. By contrast, the bankruptcy courts in *Northern Pipeline* exercised "all the jurisdiction" conferred on the District Courts. 28 U.S.C. § 1471(b) (1976 ed., Supp. III).

Moreover, the Board does not have to follow the rules of evidence, *id.* § 923, which "govern proceedings in courts of the United States * * *." Fed.R.Evid. 101.

 In sum, the removed members have not shown that the 1972 amendments created an Article III court within the Department of Labor. To the contrary, so many of the essential attributes of an Article III court were omitted that we must conclude that Congress intended to and did create an administrative appellate review board. Congress has the power to place this Board's limited function anywhere it chooses: in a federal court, in an independent agency, or in an Executive agency. *See generally* L. JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 87–94 (1965). The removed members have not shown that Congress chose the federal court route.[50] We therefore affirm the District Court on this issue.

## III. THE BOARD MEMBERS' NON-ARTICLE III STATUS

The removed members failed to prevail on their Article III claim in the District Court. But they also claimed that Congress intended that the Secretary could only remove them for "cause." Though the statute was silent concerning removal,[51] the

District Court concluded that Congress must have *intended* to so limit him because of the quasi-judicial duties it assigned to the Board. JA 144. Therefore, the District Court granted the removed members injunctive and declaratory relief on this issue. We find that the District Court was in error.

### A. The Rule of Statutory Silence

 The general and long-standing rule is that, in the face of statutory silence, the power of removal presumptively is incident to the power of appointment. *In re Hennen,* 38 U.S. (13 Pet.) 230, 10 L.Ed. 225 (1839); *Cafeteria & Restaurant Wkrs Union, Local 473 v. McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). The Supreme Court has noted that "government employment, in the absence of legislation, can be revoked at the will of the appointing officer."[52] *Id.* at 896, 81 S.Ct. at 1749. And this circuit has recently noted that "this continues to be the rule to the present day." *Nat'l Treasury Employees Union v. Reagan,* 663 F.2d 239, 247 (D.C.Cir.1981) (no nonstatutory protection for federal appointees).[53] Thus the long-standing rule would hold Board members to indefinite terms at their appointing officer's—the Secretary's —discretion.[54]

---

**50.** This conclusion is consistent with the previous holdings of various circuits, including our own. *See, e.g., Ingalls Shipbuilding Div., Litton Systems, Inc. v. White,* 681 F.2d 275, 285 (5th Cir.1982) ("administrative proceedings before the Benefits Review Board are not Article III proceedings"); *Potomac Iron Works v. Love,* 673 F.2d 537, 539 (D.C.Cir.1982) ("The Benefits Review Board is the administrative body with final responsibility for reviewing awards of compensation and related costs."); *Director, OWCP v. O'Keefe,* 545 F.2d 337, 343 (3d Cir.1976) (the Board provides an "internal administrative review of initial decisions").

**51.** 33 U.S.C. § 921(b)(1) (1976) provides:
There is hereby established a Benefits Review Board which shall be composed of three members appointed by the Secretary from among individuals who are especially qualified to serve on such Board. The Secretary shall designate one of the members of the Board to serve as chairman.

**52.** In 1912 Congress passed the Lloyd-LaFollette Act, 37 STAT. 555, presently codified at 5

U.S.C. § 7501 (1976 & Supp. V 1981), to give some statutory protection against removal without cause to federal employees generally. For example, the ALJs who hear and determine workers' compensation cases in the first instance cannot be removed except for good cause. 5 U.S.C. § 7521 (Supp. V 1981).

**53.** *See also Finley v. Hampton,* 473 F.2d 180, 189 (D.C.Cir.1972) ("any rights of a Government employee or applicant must be founded on a Congressional statute, expressly or by fair implication, * * * or a constitutional imperative").

**54.** Indeed, the rule of silence is of such long-standing tradition that it has taken on constitutional imprimatur: where purely Executive Branch officials are involved, Congress cannot even limit the removal power. *Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926). *Myers* held unconstitutional a federal statute that conferred on the President the power to appoint postmasters with "the advice and consent of the Senate," but that also re-

### 1. *The sounds of silence.*

The 1972 amendments to the Act did not specify the length or terms of Board members' service. But there are suggestions in the history of the Act and its subsequent administration that Congress affirmatively intended for Board members, as part of the Department of Labor's staff, to serve as other appointed officials serve—at the discretion of the Secretary.

For one thing, in enacting the 1972 amendments Congress plainly considered a report which recommended that, *inter alia*, members of workers' compensation appeals boards like the Benefits Review Board be appointed for fixed terms with protection against removal.[55] Congress gave "most careful consideration" to this report, *see* H.R.Rep. No. 92–1441, 92d Cong., 2d Sess. 4 (1972), but did not adopt the fixed term proposal.[56] Instead, Congress placed the Board "within the Department of Labor" and instructed the Secretary "to keep separate the functions of administering the pro-

gram and sitting in judgment on the hearings."[57] S.Rep. No. 92–1125, 92d Cong., 2d Sess. 13–15 (1972). Congress gave the Secretary the responsibility of setting "the machinery [of the Board] in motion," *Continental Air Lines, Inc. v. CAB*, 519 F.2d 944, 954–955 (D.C.Cir.1975), *cert. denied sub nom. Western Airlines, Inc. v. Continental Air Lines, Inc.*, 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 365 (1976) (*quoting Power Reactor Development Co. v. Int'l Union of Elec., Radio & Mach. Wkrs*, 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961)), and of determining the appropriate manner in which claims should be adjudicated and the Act administered.[58] *See* 33 U.S.C. § 939 (1976) (Secretary charged with duty of issuing regulations to implement the statute).

The Secretary immediately implemented Congress' instructions. In his initial organizational order the Secretary placed the Board within the Office of the Under Secretary of Labor rather than in the Office of the Assistant Secretary. 20 C.F.R. §§ 801.-104, 801.302 (1982).[59] The order explained:

quired him to obtain the same "advice and consent" in removing them. The Court ruled that to uphold the restriction "would make it impossible for the President, in case of political or other differences with the Senate or Congress, to take care that the laws be faithfully executed." *Id.* at 164, 47 S.Ct. at 41. *Myers'* broadest dicta expressed the view that the President's removal powers extended to *all* government employees who were not judges on Article III courts. *Id.* at 135. But subsequent decisions of the Court narrowed the President's powers and cut back on the implications of this dicta. *See, e.g., Wiener v. United States*, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958) (War Claims Commissioners sit for congressionally designated terms); *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) (Federal Trade Commissioners sit for congressionally designated terms).

**55.** The recommendation was one of many included in the report of the National Commission on State Workmen's Compensation Laws that was issued on July 31, 1972 (Report).

**56.** The Report warned that it "might be desirable to hold the [Executive] accountable for agency operations" and that the desire for such accountability was an argument *against* tenure with fixed terms. Report, *supra* note 55, at 102.

**57.** Congress intended that the Board provide "an internal administrative review of initial decisions in contested cases by a three-man board within the Department of Labor. This is the trend of better administered workers' compensation laws and is consistent with the recommendations of the National Commission." S.Rep. No. 92–1125, 92d Cong., 2d Sess. 14–15 (1972); *see also* H.R.Rep. No. 92–1441, 92d Cong., 2d Sess. 4 (1972).

**58.** Thus the Senate Report states:
[W]ith the new responsibilities that will devolve upon the Secretary with the passage of this bill it will be extremely important to have full time able administrators who will not also have to wear the dual hat of being hearing officers for purposes of the disputes brought under this statute.
It is also expected that the Secretary take full advantage of the requirement of separating the functions under this statute * * *. It will also be incumbent upon the Secretary as part of this reorganization to revise the regulations under this Act which have not been amended for many years.
S.Rep. No. 92–1125, *supra* note 57, at 14.

**59.** The Secretary delegated to the Under Secretary general rulemaking authority over the Board, and stipulated that the Board could issue procedural rules only "with the approval of

[Placing the Board within the Office of the Under Secretary] was deemed necessary because the Board's functions are quasi-judicial in character and involve review of decisions made in the course of the administration of the several Acts by the Employment Standards Administration which is headed by an Assistant Secretary. * * *

38 Fed.Reg. 6171 (March 7, 1973). The Secretary, consistent with Congress' intent, *see* S.Rep. No. 92–1125, *supra,* at 13–15, was attempting to insulate the Board from those who would be subject to its review—namely, the Employment Standards Administration, which the Assistant Secretary heads.[60] But the Secretary was not trying to, and did not have to, create an impregnable fortress of protection for the Board.

▮ Thus, pursuant to his statutory authority to issue regulations governing establishment and operation of the Board, 33 U.S.C. § 939 (1976), he promulgated 20 C.F.R. § 801.201(d) (1982), providing that:

All members of the Board shall serve indefinite terms to be determined in the discretion of the Secretary.

This regulation gave the Secretary *some* control over the Board, a control that Congress might have deemed necessary since the Secretary was to be held accountable for agency operations. The regulation was implemented in 1973 and has been in effect, without interruption,[61] since that time. Thus, from the inception of the 1972 amendments, those charged with administering the statute have consistently construed it as giving the Secretary the traditional power of removal.[62] In the sounds of silence, courts are "duty bound to follow 'the construction of a statute by those charged with its execution . . . unless there are compelling indications that it is wrong.'" *Haviland v. Butz,* 543 F.2d 169, 174 (D.C.Cir.), *cert. denied,* 429 U.S. 832, 97 S.Ct. 95, 50 L.Ed.2d 97 (1976) (*quoting Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969)), especially when that construction occurs contemporaneously with enactment of the statute.[63] We cannot find "compelling indications" that this regulation contravenes the congressional intent in the face of such history. Thus we must defer to the Secretary's interpretation as a sound expression of congressional will.[64]

---

the Under Secretary." 20 C.F.R. § 801.302 (1982); Secretary of Labor's Order 38–72, 38 Fed.Reg. 90 (Jan. 3, 1973).

**60.** The removed members point to the Secretary's regulation which directs the Under Secretary to promulgate regulations that will allow the Board to function "as an independent quasi-judicial body in accordance with the provisions of the statute," 20 C.F.R. § 801.104 (1982), as proof that the Board was to be totally independent of influence or control. Brief for appellees/cross-appellants at 25. But this reliance is misplaced. The Secretary was directing the Under Secretary to insulate the Board from the Assistant Secretary, not from the Secretary himself. The *internal* division of quasi-judicial and Executive functions was all that the Secretary (and Congress) apparently intended.

**61.** In 1978 the Board, pursuant to its own limited rulemaking powers, *see* 20 C.F.R. § 801.302 (1982), proposed new versions of some of its procedural rules and of the regulations governing its own operations. Although it suggested many changes, it did not propose to change 20 C.F.R. § 801.201(d). *See* 43 Fed.Reg. 42144 (Sept. 19, 1978). Both Miller and Kalaris were

Board members at this time, and signed off on the proposed changes. *See id.*

**62.** When an agency consistently adheres to a regulation, the courts heighten the deference they give to the agency's interpretation of the governing statute. *See Federal Election Comm'n v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 37, 102 S.Ct. 38, 45, 70 L.Ed.2d 23 (1981); *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978).

**63.** *See Zenith Radio Corp. v. United States, supra* note 62, 437 U.S. at 450, 98 S.Ct. at 2445; *see also Adamo Wrecking Co. v. United States,* 434 U.S. 275, 287 n.5, 98 S.Ct. 566, 573 n.5, 54 L.Ed.2d 538 (1978); *E.I. duPont de Nemours & Co. v. Collins,* 432 U.S. 46, 55, 97 S.Ct. 2229, 2234, 53 L.Ed.2d 100 (1981); *Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692, 706 (D.C.Cir.1975).

**64.** The removed members claim that we should give no deference to the Secretary's interpretation of his removal powers because a reading of this statute does not require "special agency competence or expertise." *Nat'l Petroleum Re-*

 The Secretary's interpretation of the original congressional intent is further supported by recent floor activity in Congress.[65] In 1981 Senator Don Nickles, chairman of the Subcommittee on Labor of the Senate Committee on Labor and Human Resources, introduced legislation to make the Board more independent of the administrative arm of the Department of Labor.[66] Senator Nickles explained:

The 1972 amendments also created a two-step administrative appeal process within the Department of Labor, including a Benefit Review Board whose three members are appointed by the Secretary of Labor and *serve at his pleasure.*

127 Cong.Rec. S5077 (daily ed. May 14, 1981) (emphasis added). Senator Nickles believed that the Board needed a major facelift for it to have the proper degree of independence. He believed that S. 1182 would improve the administration of the Act

by establishing the Benefits Review Board and administrative law judges as a tribunal independent of the Department of Labor. The members of the Board are to be appointed by the President for fixed terms with the advice and consent of the Senate. The Secretary of Labor and his designees will not participate in litigation before the Board. * * *

*Id.* at S5078. Thus, not only did Senator Nickles want to prevent the Secretary from removing Board members, he also wanted to elevate Board members to the status of

---

finers Ass'n v. FTC, 482 F.2d 672, 694 (D.C.Cir. 1973), cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974). But deference is "ultimately 'a function of Congress' intent,' " *Process Gas Consumers Group v. U.S. Dep't of Agriculture,* 694 F.2d 778, 791 (D.C.Cir.1982) (en banc) (quoting *Constance v. Sec'y of Health & Human Services,* 672 F.2d 990, 995 (1st Cir.1982)). Here, Congress assigned the Secretary the duty "of separating the [quasi-judicial and Executive] functions under this statute." H.R.Rep. No. 92–1441, supra note 57, at 11. Thus Congress wanted the Secretary to determine, through his experience with the Act's earlier claims procedures, the appropriate degree of independence for the Board.

Courts must give " 'great deference to the interpretation given the statute by the officers or agency charged with its administration,' " *EPA v. Nat'l Crushed Stone Ass'n,* 449 U.S. 64, 83, 101 S.Ct. 295, 307, 66 L.Ed.2d 268 (1980) (quoting *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). *See also Federal Election Comm'n v. Democratic Senatorial Campaign Committee,* supra note 62, 454 U.S. at 37, 102 S.Ct. at 45 ("deference should presumptively be afforded" to rulemaking agency); *E.I. duPont de Nemours & Co. v. Collins,* supra note 63, 432 U.S. at 54–55, 97 S.Ct. at 2234; *Kirkhuff v. Nimmo,* 683 F.2d 544, 549 (D.C.Cir.1982). This circuit has previously given deference to the Secretary's interpretation of the statute. *See, e.g., Shahady v. Atlas Tile & Marble Co.,* supra note 8, 673 F.2d at 483 (where statute ambiguous regarding proper party to judicial review of order, regulation adopted by court as clear, consistent statement of Act's intent). The same considerations lead us to give deference here.

**65.** Legislative history of subsequent legislation is entitled to significant weight in construing earlier, related legislation. *See, e.g., Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380–381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969); *Federal Housing Admin. v. Darlington, Inc.,* 358 U.S. 84, 90, 79 S.Ct. 141, 145, 3 L.Ed.2d 132 (1958). But legislative history of non-enacted subsequent legislative proposals provides a much more "hazardous basis for inferring the meaning of a congressional enactment." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 118 n.13, 100 S.Ct. 2051, 2061 n.13, 64 L.Ed.2d 766 (1980). Such legislative history can be "relevant" and "useful," *id.,* but it does not bear a strong degree of reliability. We need not specify *how* relevant and useful the history of this 1981 proposed legislation is in this case; we note it only as additional evidence that the original congressional silence sounded support for the general rule that the power of removal is incident to the power of appointment.

**66.** Senator Nickles described S. 1182 as:

A bill to amend the Longshoremen's and Harbor Workers' Compensation Act to revise the manner of computing the benefits provided under such act, to provide for certification of physicians eligible to provide medical care to workers covered by such act, to provide for an attorney to serve as the representative of the special fund established under such act, *to establish a Benefits Review Board the members of which are appointed by the President,* to establish an advisory committee to evaluate the manner in which the provisions of the act are carried out, and for other purposes[.]

127 Cong.Rec. S5076 (daily ed. May 14, 1981) (emphasis added).

officers of the United States (as opposed to inferior officers) and leave their appointment to the President.

The proposed bill was the subject of intensive debate in the legislative hearings, especially concerning the status of the Board. *See Hearings on Longshoremen's and Harbor Workers' Compensation Act Amendments of 1981 Before the Subcommittee on Labor of the Committee on Labor and Human Resources of the United States Senate,* 97th Cong., 1st Sess. (1981) (1981 Hearings). Then-chairman of the Board, Samuel Smith, testified that:

> The Board performs the same judicial function which the U.S. District Courts exercised prior to 1972. The term of office is indefinite with no procedures for removal. * * *
>
> * * * * * *
>
> * * * An important change proposed in S. 1181 is the removal of the Board from the Department of Labor and its establishment as an independent agency. * *

1981 Hearings at 217, 219 (statement of Chairman Samuel Smith). Some other witnesses argued that the Board should be removed from the Department of Labor and made independent of the Secretary,[67] while other witnesses argued that the Board should remain accountable to the Secretary.[68] But no one argued that the Board was *already* independent of the Secretary; the debate centered on whether change was desirable.[69] Thus it would appear that the current Congress might view the independence of Board members as a *change* from their present status. These are sounds of congressional silence that reinforce the Secretary's present claim of authority to remove Board members at his discretion.

### 2. *Quasi-judicial functions.*

Despite the Secretary's presumptive right to remove his appointees at his discretion and the administrative and congressional history affirming this presumption, the removed members argue that Congress could not have intended to grant the Secretary this influence and control over officials who perform this "quasi-judicial" function of adjudicating "private rights."[70] Rather, to

**67.** For witnesses acknowledging Board dependence and favoring a change, *see, e.g.,* 1981 Hearings at 277 (statement of Thomas Wilcox, Executive Director and General Counsel, National Association of Stevedores); *id.* at 1049 (statement of the Alliance of American Industries); *id.* at 1063 (statement of the American Insurance Association); *id.* at 1067 (statement of the National Association of Independent Insurers).

**68.** For witnesses acknowledging Board dependence and favoring the status quo, *see, e.g.,* 1981 Hearings at 524 (statement of International Longshoremen's and Warehousemen's Union); *id.* at 993 (statement of Jay Power, Legislative Representative, American Federation of Labor and Congress of Industrial Organizations); *id.* at 1193–1197 (testimony by Department of Labor).

**69.** Ultimately, the version of the bill that left the Senate did not adopt fixed terms for Board members, though it would increase the number of persons who could review workers' compensation claims. Section 13 of the bill as it left the Senate permitted the Secretary to appoint four "temporary" appointees to the Board and provided for an *en banc* process in which a majority of the panel sitting could reverse three-member panel decisions. *See* 127 Cong. Rec. S9202 (daily ed. July 27, 1982). The bill is currently pending before the House. *See* brief for appellants/cross-appellees at 24; reply brief for appellants/cross-appellees at 24 n. 7.

**70.** The Board's "quasi-judicial" function cannot be disputed. The Secretary's own regulations define it as such. *See* note 15 *supra* and accompanying text. *See also* Job Description for Administrative Appeals Judge, JA 95–98 (judges exercise independent judgment in discharging their duties and responsibilities); Justification for Classification of Supergrade Position, JA 99–102 (the Board serves as a "constitutional court," and its "final decision making authority/independence of operation is truly *unique* in Government * * * in that other appeal boards are subject to the general direction and supervision of Agency Heads/higher level agency officials who have the authority to review board decisions") (emphasis in original).

Likewise, the fact that the Board adjudicates cases of "private rights" cannot be disputed. *See* notes 34–36 *supra* and accompanying text. The Supreme Court previously characterized workers' compensation claims as cases of "private rights" in *Crowell v. Benson, supra* note 35, 285 U.S. at 51, 52 S.Ct. at 292, and reaffirmed this characterization in *Northern Pipeline Const. Co. v. Marathon Pipe Line Co., supra* note 27, —— U.S. ——, 102 S.Ct. at 2873.

preserve the unbiased, independent judgments of these officials, the removed members claim that Congress must have intended that the Secretary, at a minimum, show "cause" to remove them. The District Court agreed with them, finding that the general rule of silence has no application to officials who perform a "quasi-judicial" function. The District Court drew upon the Supreme Court's decisions in *Humphrey's Executor v. United States, supra,* and *Wiener v. United States, supra,* in constructing this interpretation of the 1972 congressional intent. JA 143–144.

*Humphrey's Executor* involved President Roosevelt's attempt to remove a member of the Federal Trade Commission (FTC)—an independent regulatory agency that Congress created to perform "quasi-legislative" and "quasi-judicial" tasks [71]—without cause.[72] Congress established the FTC as a body independent of the Executive Branch, prescribed fixed terms for its commissioners, and stipulated the exclusive terms for their removal to be "inefficiency, neglect of duty, or malfeasance in office." 295 U.S. at 620, 55 S.Ct. at 870. In rejecting President Roosevelt's claim to discretionary removal power over FTC commissioners, the Supreme Court stated:

> The authority of Congress, in creating quasi-legislative or quasi-judicial agencies, to require them to act in discharge of their duties independently of executive control cannot be well doubted; and that authority includes, as an appropriate incident, power to fix the period during which they shall continue in office, and to forbid their removal except for cause in the meantime. For it is quite evident

that one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will. *Id.* at 629, 55 S.Ct. at 874. Thus *Humphrey's Executor* trimmed back considerably on the broad, constitutionally-based removal powers the President had hitherto enjoyed.[73]

*Wiener* presented the Supreme Court with a very similar presidential effort to exercise broad removal powers. In *Wiener* the Court ruled that President Eisenhower could not remove members of the War Claims Commission (WCC)—the body responsible for making final determinations regarding awards to those suffering injury or property damage at the hands of the enemy during World War II—at his discretion.[74] Congress placed the WCC outside the Executive Branch, gave the Commission itself (and thus its members) a limited term of three years, and stipulated that the Commission's decisions were not "subject to review by any other official of the United States or by any other court by mandamus or otherwise * * *." 357 U.S. at 354–355, 78 S.Ct. at 1278–1279. But nothing was explicitly said in the Act about removal. So the Court noted that it was faced with "another instance in which the most appropriate legal significance must be drawn from congressional failure of explicitness. Necessarily this is a problem in probabilities." *Id.* at 352–353, 78 S.Ct. at 1277–1278. Based on all the limits Congress placed on Executive power in the Act, the Court concluded that Congress did not intend to allow the President to remove WCC commissioners at his discretion. *Id.* at 354–356, 78 S.Ct. at 1278–1279.

---

**71.** 295 U.S. at 624, 55 S.Ct. at 872. On the organization, history, and reorganization of the FTC, *see* S. Breyer & R. Stewart, Administrative Law and Regulatory Policy 725–794 (1979); Elman, *Administrative Reform of the Federal Trade Commission,* 59 Geo. L.J. 777 (1971). *See generally* Posner, *The Federal Trade Commission,* 37 U.Chi.L.Rev. 47 (1969).

**72.** 295 U.S. at 618–619, 55 S.Ct. at 870 (removal not a reflection on the commissioner or his services). For commentary on *Humphrey's Executor, see* S. Breyer & R. Stewart, *supra* note 71, at 88–90, 92–95; K. Davis, Administrative

Law of the Seventies § 1.09–1 at 15–19 (1977); L. Jaffe, Judicial Control of Administrative Action 21–23 (1965).

**73.** *See* note 54 *supra.*

**74.** For commentary on *Wiener, see* S. Breyer & R. Stewart, *supra* note 71, at 90–95; K. Davis, *supra* note 72, § 1.09–1 at 15–19; L. Jaffe, *supra* note 72, at 21 n. 27. For additional judicial elaboration, *see* Morgan v. TVA, 115 F.2d 990 (6th Cir.1940), *cert. denied,* 312 U.S. 701, 61 S.Ct. 806, 85 L.Ed. 1135 (1941).

But *Humphrey's Executor's* FTC and *Wiener's* WCC were structurally very different from the Board, and it was these structural differences that prompted the Court to limit the Executive's removal power. To begin with, both FTC and WCC members had fixed terms, FTC members' terms being fixed by statute and WCC members' terms being fixed by the limited life of the Commission. *Humphrey's Executor,* which was the foundation of the *Wiener* decision, *see* 357 U.S. at 352, 354, 356, 78 S.Ct. at 1277, 1278, 1280, went to great lengths to limit its holding to cases where Congress had defined fixed terms for agency members.[75] 295 U.S. at 622, 631–632, 55 S.Ct. at 871, 875. *Humphrey's Executor* stated that the facts before it were "plainly and wholly different" from the facts in cases such as *Shurtleff v. United States,* 189 U.S. 311, 23 S.Ct. 535, 47 L.Ed. 828 (1903), which held that officers whose terms are not fixed by statute serve at the pleasure of the officers who appoint them.[76] *Id.* at 621–623, 55 S.Ct. at 871–872.[77] Second, both the FTC and the WCC were placed *outside* the Executive Branch, as separate, independent tribunals.[78] The Board, by contrast, was placed "within the Department of Labor,"[79] as an "internal" administrative appellate review board,[80] and it relies very much on the Department for its effective day-to-day operations.[81] Third, the Executives removing both FTC and WCC commissioners did not rely on previously promulgated regulations interpreting the congressional silence; rather, they acted in contravention of explicit con-

75. The Court stated:
 The authority of Congress, in creating quasi-legislative or quasi-judicial agencies, to require them to act in discharge of their duties independently of executive control cannot be well doubted; and that authority includes, as an appropriate incident, power to fix the period during which they shall continue in office, and to forbid their removal except for cause in the meantime. * * *

 * * * * * *

 * * * Whether the power of the President to remove an officer shall prevail over the authority of Congress to condition the power by fixing a definite term and precluding a removal except for cause, will depend upon the character of the office; the *Myers* decision, affirming the power of the President alone to make the removal, is confined to purely executive officers; and as to officers of the kind here under consideration, we hold that no removal can be made during the prescribed term for which the officer is appointed, except for one or more of the causes named in the applicable statute.
 295 U.S. at 629, 631–632, 55 S.Ct. at 874–875.

76. *Shurtleff v. United States,* 189 U.S. 311, 23 S.Ct. 535, 47 L.Ed. 828 (1903), rejected the claim of a general appraiser, whose term was not fixed by statute, that he could not be removed at the pleasure of the appointing authority. The Court stated:
 We are asked [to adopt a construction of the Act which] results in the creation of a tenure of this particular office, not attached to a single other civil office in the government, with the exception of judges of the courts of the United States. We cannot bring ourselves to the belief that Congress ever intended this result while omitting to use language which would put that intention beyond doubt. * * *
 189 U.S. at 318, 23 S.Ct. at 537.

77. *Humphrey's Executor* placed equal weight on both the statutorily provided fixed terms and the stated grounds for removal. 295 U.S. at 631–632, 55 S.Ct. at 875. The removed members here properly point out that the act creating the WCC, like the act creating the Board, was silent on the grounds for removal. Brief for appellees/cross-appellants at 20–22. But the failure to specify the grounds for removal does not make the WCC enough like the Board to bring this case within *Wiener's* logic. FTC and WCC share many attributes: fixed terms of office, the mode of member appointment, their separation from any Executive agency, clear expressions by Congress of an intent that they function independently, and performance of functions which was furthered by their independence. It was these shared attributes that allowed *Humphrey's Executor* and *Wiener* to limit the Executive's removal power. The Board shares few of these attributes.

78. The FTC is an independent regulatory agency, a member of the so-called "headless fourth branch." L. JAFFE, *supra* note 72, at 22. The WCC had final authority over war claims, completely free of the Federal Security Administrator. S.Rep. No. 1742, 80th Cong., 2d Sess. (1948).

79. S.Rep. No. 92–1125, *supra* note 57, at 14–15.

80. *Id.*

81. *See* note 15 *supra.*

gressionally-mandated terms of office. By contrast, here the Secretary relies on his own regulation promulgated a decade ago. Such a regulation deserves the deference of this court, absent compelling indications that it is wrong. *See* note 64 *supra.* Fourth, and finally, both the FTC and the WCC members were made officers of the United States, appointed by the President with the advice and consent of the Senate. 295 U.S. at 620, 55 S.Ct. at 870; 357 U.S. at 350, 78 S.Ct. at 1276. Board members, by contrast, are inferior officers of the United States, appointed by the Secretary of Labor. Had Congress wished to give Board members something more than the "lesser dignity" of officials appointed and removable at the discretion of the respective heads of their departments, it could have said so explicitly.[82] But it chose to remain silent.

■ In short, *Humphrey's Executor* and *Wiener* involved structurally distinguishable entities and do not serve as appropriate support for the removed members' claim. Indeed, the Supreme Court's decisions in *Reagan v. United States,* 182 U.S. 419, 21 S.Ct. 842, 45 L.Ed. 1162 (1901), and *In re Hennen,* 38 U.S. (13 Pet.) 230, 10 L.Ed. 225 (1839), are more clearly on point and control this case. In *Reagan* the Court held that the commissioners of Indian Territory, inferior officers who performed entirely judicial functions—like justices of the peace—were removable at will in the absence of a con-gressionally fixed term.[83] 182 U.S. at 426–427, 21 S.Ct. at 845. In *Hennen* the Court found that a District Court judge could remove, at his discretion, a clerk of the court since no tenure in office was specified in either the Constitution or the statute.[84] 38 U.S. (13 Pet.) at 259. The *Hennen* Court stated:

All offices, the tenure of which is not fixed by the Constitution or limited by law, must be held either during good behaviour, or (which is the same thing in contemplation of law) during the life of the incumbent; or must be held at the will and discretion of some department of the government, and subject to removal at pleasure.

It cannot, for a moment, be admitted, that it was the intention of the Constitution, that those offices which are denominated inferior offices should be held during life. And if removable at pleasure, by whom is such removal to be made[?] In the absence of all constitutional provision, or statutory regulation, it would seem to be a sound and necessary rule, to consider the power of removal as incident to the power of appointment. * * *

*Id. See also DeCastro v. Board of Comm'rs of San Juan,* 322 U.S. 451, 462, 64 S.Ct. 1121, 1127, 88 L.Ed. 1384 (1944) (interpreting a statute so that implying life tenure for a large group of "municipal employees [would be] in disregard of the rule of *Shurt-*

---

**82.** *See* Currie & Goodman, *supra* note 40, 75 COLUM.L.REV. at 14 (distinguishing "independent regulatory commissions, whose members are appointed by the President with congressional approval and [who] enjoy a secure, if limited, tenure" from those "quasi-judicial tribunals" of "lesser dignity" which are staffed "by members appointed and removable at will by the respective heads of their departments," and giving the Board as an example of the latter).

**83.** The removed members seek to bypass *Reagan v. United States,* 182 U.S. 419, 21 S.Ct. 842, 45 L.Ed. 1162 (1901), by arguing that *Humphrey's Executor* and *Wiener* have significantly impaired or destroyed its precedential value. Brief for appellees/cross-appellants at 35. This argument rests on a wholly contorted reading of all three cases. *Humphrey's Executor* and *Wiener* involved presidential appointments for fixed terms; the *Reagan* Court specifically not-ed that the Indian commissioners were inferior officers, "not holding their offices for life, or by any fixed tenure, and * * * within the settled rule that the power of removal is incident to the power of appointment." 182 U.S. at 424, 21 S.Ct. at 845. We find *Reagan* to be good law and controlling precedent.

**84.** The District Court attempted cursorily to distinguish *Reagan* and *Hennen* by referring to the exception to the general rule that is "implied by the nature of the office." JA 144. But the Board is materially different from the offices discussed in *Humphrey's Executor, Wiener,* and Article III. Moreover, it seems much like the offices established in scores of other administrative systems. *See* notes 98–101 *infra* and accompanying text. Thus we do not understand how the Board fits into the *Hennen* exception.

leff v. United States"); Nat'l Treasury Employees Union v. Reagan, 663 F.2d 239, 246–248 (D.C.Cir.1981) (relying on Hennen). These cases conclusively demonstrate that, in the absence of a congressional statement to the contrary, inferior officers such as those on the Board serve indefinite terms at the discretion of their appointing officers.[85]

B. *Constitutionality of the Organizational Scheme*

 We thus hold that Congress intended to create a Board whose members serve indefinite terms at the discretion of their appointing officer.[86] The Secretary can therefore remove these members at his discretion unless there is some constitution-

al impediment to his doing so.[87] The District Court found that it would be unconstitutional for the Secretary to have a power of removal over Board members because such a power would "permit him to influence claims decisions outside the adjudicatory process through replacement of the entire Board." JA 142. But it avoided bringing the constitutionality of the organizational scheme into question by finding that Congress intended to make the Board independent of the Secretary.[88] Since we find that Congress intended Board members to serve at the Secretary's discretion, we must judge the constitutionality of the organizational scheme.[89] We find that assignment

---

**85.** The removed members concede that their procedural arguments for notice and hearing stand or fall with the substantive arguments concerning the Secretary's discretion to remove them without cause. *See* brief for appellees/cross-appellants at 12–13. Since we find that the Secretary can remove at his discretion, we accept the removed members' concession and do not address the procedural arguments. Since we find that these Board members can be *removed* at the Secretary's discretion, we need not address whether the Secretary could *transfer* them without notice and hearing were "cause" a requirement. *Cf.* brief for appellants/cross-appellees at 26 n. 25 (pointing out that this was a *transfer,* not a *dismissal*).

**86.** We reach this conclusion on the basis of *all* of the available evidence: the presumption that the removal power is incident to the appointment power, Congress' silence in the face of this presumption, the pre-enactment legislative history, the Secretary's contemporaneous and consistent interpretation of his authority, and the recent floor activity to amend the Act.

**87.** Though the removed Board members have not pressed the argument, the Secretary notes that they could alternatively challenge the discretionary actions as arbitrary and capricious, *see* 5 U.S.C. § 706(2)(A) (1976 & Supp. V 1981), as an abuse of discretion. *See* brief for appellants/cross-appellees at 17–19. But the Secretary acted pursuant to a valid regulation, and the removals therefore cannot be characterized as arbitrary or capricious or not in accordance with law. Neither can the underlying regulation be challenged as irrational: the Secretary is free to promote the efficiency of the Department by making Board members accountable, at least in some degree, to him.

**88.** The District Court expressly did not decide whether Congress could constitutionally assign the functions of the Board to the Secretary. JA

144. Our holding necessarily encompasses this question as well.

**89.** There is a legitimate question as to whether the removed Board members have standing to challenge the constitutionality of Congress' decision to make them serve at the discretion of their appointing authority. *Cf.* note 27 *supra* (no insuperable standing issue under Article III where the Act could be interpreted to have created an Article III court). At an irreducible minimum, Article III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976). *See generally Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., supra* note 27. Obviously, the removed Board members here have suffered an actual injury from their removal by the Secretary. Their injury can be traced to his removing them without hearing or explanation. But it is not clear that their injury will be redressed by a favorable decision.

A court is empowered to examine Congress' jurisdictional grants and to determine whether such grants are valid. The courts cannot correct an invalid grant by filling in one of a variety of constitutional terms. Rather, the most a court can do is void the Board's jurisdictional grant and leave to Congress the decision of how to reconstitute the workers' compensation claims adjudicatory mechanism. *Cf. Northern Pipeline Const. Co. v. Marathon Pipe Line Co., supra* note 27, —— U.S. at ——, 102

of initial review of adjudication of workers' compensation claims to an administrative review board whose members serve at the discretion of their appointing officer is clearly constitutional.

 Under our constitutional scheme, tenure in office is during good behavior, for statutorily fixed periods and stipulated terms, or at the discretion of the appointing officer. *In re Hennen, supra; Nat'l Treasury Employees Union v. Reagan, supra.* The Constitution *mandates* that members of Article III courts have life tenure during good behavior. The Constitution *permits* Congress to establish fixed terms for members of tribunals that are independent of the Executive Branch; when Congress statutorily specifies the terms of tenure and removal for United States officials it does not infringe upon the autonomy of the Executive Branch. But where Congress has neither created an Article III court nor established by legislation the terms for tenure and removal, the Constitution leaves the tenure of these officers to the discretion of the appointing officer. *Cafeteria & Restaurant Wkrs Union, Local 473 v. McElroy, supra; Myers v. United States, supra; Reagan v. United States, supra.* Properly understood, these tenure rules are part of the careful balance of structural separation of powers limitations and protections that the Constitution places on Congress, the Executive, and the courts.

The District Court found, and we agree, that the Board is not an Article III court and therefore that the Constitution does not require that its members serve during good behavior. JA 144–145. But the District Court, invoking separation of powers principles, concluded that Board members could not constitutionally be removed at will; it found that the Constitution *requires* Congress to create "quasi-judicial" bodies that are independent of the appointing officer. JA 144. Quoting from *Humphrey's Executor, supra,* 295 U.S. at 629–630, 55 S.Ct. at 874, the District Court explained:

> The fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question. So much is implied in the very fact of the separation of the powers of these departments by the Constitution; and in the rule which recognizes their essential co-equality. * * *

JA 142. It found support for its application of separation of powers principles in both *Humphrey's Executor* and *Wiener.*[90]

S.Ct. at 2879 (remanding to Congress the decision of how to reconstitute the bankruptcy courts). The most we can do here is declare void the congressional authorization that allows the Secretary to determine the terms upon which Board members serve; we cannot grant these Board members the terms they would prefer. But this constitutional declaration involves abolition of the very offices the removed members seek to retain. Thus it is difficult for us to discern whether remanding to Congress to provide appropriate protections or to change the adjudicatory structure would adequately redress the removed members' injuries.

The District Court apparently assumed that the removed members had standing to challenge the constitutionality of the Act, and the parties did not adequately brief the issue. Thus we do not have sufficient information to resolve whether their injuries would be adequately redressed.

Nevertheless, we state our views on the constitutionality of the Act to prevent future litigation over this constitutional issue. The Supreme Court has already decided that adjudica-tion of workers' compensation claims can constitutionally be delegated, at least in the initial stage, to administrative adjuncts. *Crowell v. Benson, supra* note 35. The 1972 amendments to the Act did not change the initial adjudicatory mechanism; the amendments merely created an additional stage of administrative review. All we decide is that *Crowell* remains dispositive of the constitutionality of the congressional delegation. Such an obvious holding does not endanger any of the policies implicit in Article III which forebode against deciding cases where the alleged injury may not be redressed by a favorable decision. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., supra* note 27, 454 U.S. at 471–476, 102 S.Ct. at 757–761 (discussing such policies).

**90.** JA 141 ("The Supreme Court looks to the functions of an administrative body in determining whether Congress intended the Executive branch of government to be able to remove its officers at will. *Wiener v. United States,* 357 U.S. 349, 353[, 78 S.Ct. 1275, 1278, 2

But the District Court misinterpreted the Supreme Court's discussion of separation of powers principles in both *Humphrey's Executor* and *Wiener*. *Humphrey's Executor* did not hold that Congress was *required* to make FTC commissioners independent of the President; rather, it decided that separation of powers limitations and protections *allowed* Congress to supplant the President's traditional removal authority. Similarly, *Wiener* did not hold that Congress was *required* to make WCC commissioners independent of the President; rather, it decided that separation of powers limitations and protections *allowed* Congress to do so. In each case the Court looked to the function the administrative body was to perform to determine if Congress was infringing upon the Executive's constitutional power, not to see if the Executive was infringing upon the administrative agency's adjudicative function.[91] *See* note 75 *supra.*

Indeed, the Supreme Court has already decided that Congress can constitutionally confer on an administrative adjunct jurisdiction to decide the liability of an employer to an employee under the Act. *Crowell v. Benson, supra,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598.[92] *Crowell* held that Congress could constitutionally assign the initial determination of workers' compensation claims to deputy commissioners, the subordinates of the Act's Executive officers. *Id.* at 51, 54, 52 S.Ct. at 292, 293. *Crowell* determined that this scheme satisfied the constitutional mandate of separation of powers embodied in Article III[93] and did not improperly withdraw necessary questions from judicial consideration or "interfere with * * * the exercise by the court of its jurisdiction * * *." *Id.* at 49–50, 52 S.Ct. at 291–292.

Of course, the Act as presently codified differs from the *Crowell* version. ALJs now perform the initial adjunct adjudicatory function that the deputy commissioners performed before the 1972 amendments.[94] And the Board now performs the initial appellate review that the District Courts used to perform.[95] But the "essential attributes of the judicial power" remain in the Article III courts, and the Board is simply an additional layer of administrative

---

L.Ed.2d 1377] (1958); *Humphrey's Executor v. United States,* 295 U.S. 602, 628 [, 55 S.Ct. 869, 874, 79 L.Ed. 1611] (1935)."); JA 144 ("The nature of the Board's duties requires independence from the Secretary. The Board is analogous to the positions of Federal Trade Commissioner in *Humphrey's Executor v. United States, supra,* and War Claims Commissioner in *Wiener v. United States, supra.*").

91. There are constitutional limitations on commingling of Executive and adjudicatory functions, but these arise out of the due process clause, not separation of powers principles. *See, e.g., Connally v. Georgia,* 429 U.S. 245, 97 S.Ct. 546, 50 L.Ed.2d 444 (1977) (*per curiam*); *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1974); *In re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1967). The removed members have not raised and could not raise such due process allegations here because they cannot be subject to the potential unfairness in adjudication that due process protects against.

92. *Northern Pipeline* expressly reaffirmed *Crowell*'s holding on the use of adjuncts in adjudication of federal statutory rights. —— U.S. at ——–——, 102 S.Ct. at 2871–2875. *Crowell*'s other holding, with respect to review of

"jurisdictional" and "constitutional" facts, has been undermined in later cases. *See, e.g., St. Joseph Stock Yards Co. v. United States,* 298 U.S. 38, 53, 56 S.Ct. 720, 726, 80 L.Ed. 1033 (1936). *See generally* 4 K. Davis, Administrative Law Treatise §§ 29.08, 29.09 (1st ed. 1958).

93. We do not hold that separation of powers principles and Article III requirements are synonymous. Nor do we ignore the fact that due process concerns may prohibit some commingling of functions. *See* note 91 *supra.* We simply hold that for purposes of deciding whether the Secretary can remove Board members at his discretion, separation of powers principles and Article III provide coextensive instructions. We cannot see how these constitutional arguments differ for determining the discretionary removal issue.

94. *See* notes 11–13 *supra* and accompanying text. *See also Atlas Roofing Co. v. OSHRC, supra* note 35, 430 U.S. at 450 n. 7, 97 S.Ct. at 1266 n. 7.

95. *See* notes 17 & 37–42 *supra* and accompanying text; *see generally* notes 46–50 *supra* and accompanying text.

review.[96] Thus, for constitutional purposes, the organizational scheme created in the 1972 amendments does not differ from the *Crowell* version. *Crowell,* therefore, is dispositive of this case.

 The removed members are certainly correct in characterizing the Board as performing a "quasi-judicial" function.[97] But this general characterization does little to distinguish the Board, constitutionally, from the scores of administrative boards and tribunals in the Executive Branch that currently adjudicate claims to federal statutory rights. *See generally* S. BREYER & R. STEWART, ADMINISTRATIVE LAW AND REGULA-

TORY POLICY 37–102 (1979). Many statutes directly grant the Executive power to remove officials performing quasi-judicial tasks.[98] Other statutes grant broad delegatory powers pursuant to which heads of agencies have required members of "quasi-judicial" boards to serve at their discretion.[99] And many other statutes authorize agency heads to influence or control indirectly the adjudications of their "quasi-judicial" boards.[100] The removed members have not shown how these other tribunals and boards differ, either structurally or functionally, in a constitutionally significant sense.[101] Nor have they indicated why

96. *See* note 40 *supra* and accompanying text; *see generally* notes 46–50 *supra* and accompanying text.

97. *See* note 15 *supra.*

98. *See, e.g.,* Federal Services Impasses Panel, 5 U.S.C. § 7119(c)(3) (Supp. V 1981) (Panel member "may be removed by the President"); *id.* § 7119(c)(5)(B) (duties of Panel include "hold[ing] hearings," "administer[ing] oaths, tak[ing] testimony," in the course of resolving negotiation impasses between government agencies and unions); Board of Directors, National Consumer Cooperative Bank, 12 U.S.C. § 3013 (Supp. V 1981) (President may remove any member at any time with or without cause); *id.* § 3023 (Board of Directors hears appeals from denials of applications for assistance).

99. *See, e.g.,* Department of Justice, Board of Immigration Appeals, 8 U.S.C. § 1103 (1976); 8 C.F.R. § 3.1 (1982) (members appointed by the Attorney General "shall serve at his discretion" and perform the quasi-judicial function of adjudicating cases coming before the Board; claims heard include deportation and exclusion of aliens, imposition and collection of fines); Department of Health and Human Services, Departmental Fellowship Review Panel, 45 C.F.R. § 10.1 (1981) (hearings on denial/discontinuance of fellowship/traineeship award by constituency agency); *id.* § 10.2 ("panel of 12 members selected by the Secretary, for such terms as may be designated by him").

100. *See, e.g.,* Department of Health and Human Services, Provider Reimbursement Review Board, 42 U.S.C. § 1395 (1976) (Board reviews denials of Medicare reimbursement to hospitals; review of Board's decision by Secretary at his discretion); Department of Defense, Board of Correction of Military Records, 10 U.S.C. § 1552 (Supp IV 1980); 32 C.F.R. § 723.2 (1982) (members of Board appointed by Secre-

tary of a military department); *id.* § 723.6 (final review by Secretary of Navy of Board decisions); Department of Housing and Urban Development, Board of Contract Appeals, 24 C.F.R. § 20.4(b) (1982). Other examples may be found in brief for appellants/cross-appellees at 14–16 nn. 14 & 16.

101. The removed members press three ultimately unpersuasive grounds on which to distinguish the Board from the scores of other tribunals and boards in the Executive Branch. First, they argue that many "quasi-judicial" boards can be distinguished because they are created by regulation rather than, as is the Board, by statute. This distinction *could* be a persuasive one for purposes of determining congressional intent, but it cannot be one for supporting a constitutional distinction. The constitutional requirement of independence—of separating the adjudicator from the administrator—must arise either from the attributes of the judicial power that the Board is vested with (no matter by whom) or from the danger of bias inherent in the commingling of powers. The constitutional requirement of independence has little to do with the source of creation of the adjudicatory power. In any event, in this case Congress did not even intend to keep the Board independent of the Secretary: it gave him the responsibility of issuing regulations to govern the Board. Thus the purported distinction is inadequate on all counts. Second, they argue that this Secretary, unlike other appointing officers, has no oversight or review powers. But however accurate this charge might be— and we do not decide this issue—it does not state a constitutional difference. Freedom from oversight is a protection accorded to constitutional courts; it is not a test of their existence. Indeed, mere freedom from review could not even decide the issue of congressional intent: Congress could rationally create an administrative board with *some* (as opposed to complete) accountability to the agency head.

the additional degree of independence and protection they seek is essential for dispassionate decisionmaking under this statute, and not others, for constitutional purposes.[102] Congress has been creating quasi-judicial boards subject to Executive control for years,[103] and the courts have not previously prevented them from doing so. To do so now "would be to turn the clock back on at least a * * * century of administrative law," *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 400, 60 S.Ct. 907, 915, 84 L.Ed. 1263 (1940) (rejecting challenge to quasi-judicial authority delegated to the Department of the Interior in the Bituminous Coal Conservation Act of 1935), and would unnecessarily call into constitutional question the validity of the many quasi-judicial boards whose judgments are subject to the direct or indirect control of the Executive Branch. We refuse to do either.

## IV. Conclusion

The long-standing rule relating to the removal power is that, in the face of congressional silence, the power of removal is incident to the power of appointment. We can find nothing in Article III or this Act which interdicts this long-standing rule. All of the available evidence indicates that Congress intended to allow the Secretary to remove these Board members in his discretion, and nothing in Article III, separation of powers principles, or the decisions of the Supreme Court prevents Congress from doing so. Thus the judgment of the District Court is

*Affirmed in part*[104] *and reversed in part.*[105]

---

The removal power would provide this indirect source of accountability. Third, they argue that some administrative boards are not confined to adjudicating private rights, but also possess policymaking roles. Again, this distinction has no constitutional import: the degree of decisional independence constitutionally required does not vary with the additional nonjudicial duties that a tribunal is asked to perform. Rather, as the earlier discussion of *Northern Pipeline* indicates, the degree of independence required varies with the judicial attributes that are placed in a particular adjudicatory body. The purported distinction merely underscores the fact that Congress does not keep quasi-judicial functions strictly isolated from Executive functions. In sum, the three purported distinctions cannot distinguish the other Executive tribunals for either constitutional or congressional intent purposes.

102. Indeed, it is unlikely that the removed members could even prove factually that tenure protections of the sort they seek add to the dispassion of decisionmaking. Whatever the framers may have initially thought, untenured judges, without secure salaries, can, in many cases, dispense justice evenhandedly. Krattenmaker, *supra* note 26, 70 Geo.L.J. at 306; *cf.* Posner, *The Behavior of Administrative Agencies,* 1 J. Legal Stud. 305, 328 (1972) (testing empirically and finding little evidence to support the hypothesis that combining administrative and adjudicative functions in a single agency produces unfairness). In this regard, it is interesting to note that virtually no state system provides for life tenure of its judges, *see* S.Rep. No. 405, 91st Cong., 2d Sess. 8 (1970), but these systems, for the most part, are capable of fairly handling day-to-day legal disputes. *See* Bator, *The State Courts and Federal Constitutional Litigation,* 22 Wm. & Mary L.Rev. 605, 623–635 (1981).

103. Congress has successfully established Article I courts both to administer statutes in the territories, *see American Ins. Co. v. Canter,* 26 U.S. (1 Pet.) 511, 541, 7 L.Ed. 242 (1828), and the District of Columbia, *see Palmore v. United States, supra* note 27, 411 U.S. at 394, 93 S.Ct. at 1674, and to serve the military, *see O'Callahan v. Parker,* 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969). It has also constitutionally created legislative courts, magistrates, and administrative agencies to adjudicate public rights and to serve as adjuncts to the federal courts. *See United States v. Raddatz, supra* note 38; *Atlas Roofing Co. v. OSHRC, supra* note 35, 430 U.S. at 450, 97 S.Ct. at 1266.

104. *See* note 50 *supra* and accompanying text.

105. *See* notes 85–86 *supra* and accompanying text.