Emery **KLEIN** and Diane **Klein**, Plaintiffs,

v.

**UNITED STATES of America,** Defendant.

No. 98–CV–72344–DT.

United States District Court, E.D. Michigan, Southern Division.

May 4, 2000.

Stuart A. Smith, New York City, Lawrence S. Jackier, Jackier, Gould, Bloomfield Hills, MI, for plaintiffs.

John A. Lindquist, U.S. Department of Justice, Tax Division, Washington, DC, for defendants.

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

CLELAND, District Judge.

### I. Introduction

This case involves a dispute over whether plaintiff Emery Klein[1] was negligent in his failure to pay taxes for tax year 1982 by using a tax shelter that was ultimately disallowed. If so, a negligence penalty may be appropriate. This court previously dismissed Mr. Klein's other tax-related claims on April 13, 1999 in *Klein v. United States of America*, 86 F.Supp.2d 690.[2] Currently before the court is the government's January 11, 2000 "Motion for Summary Judgment." Mr. Klein responded on February 23, 2000, and the government replied on February 24, 2000.[3]

### II. Background[4]

The historical backdrop of this case is significant. As anyone who remembers the 1970s and 1980s can attest, public attention was consumed with the perceived "energy crisis" caused by sharp decreases in the supply of oil and the consequent increase in its price, as well as that of petrochemical products like plastic. In response, Congress enacted "energy tax credits" to encourage manufacturing practices that would decrease the nation's dependence on oil.

In 1982, the taxable year at issue, Mr. Klein served as president of an electronic export-import business called Alaron, Inc, in which capacity he was responsible for making financial decisions. During that time, he also made personal investments through a partnership known as E.B.A. Investment Co. ("EBA"), in which he held a ⅛ interest through a revocable trust.

From 1957 onward, Mr. Klein relied on the professional advice of certified public accountant Jack Klain ("Klain") in his various financial dealings, and the two men also formed a friendship. In 1982, Klain introduced Mr. Klein to a tax attorney named Fred Gordon ("Gordon"). Klain and Gordon had known and worked with

---

1. Diane Klein is a plaintiff in this matter solely by virtue of the fact that she filed a joint tax return with her husband, Emery Klein, for the year at issue. It is his actions that are the subject of the instant dispute.

2. By the Honorable Victoria A. Roberts, United States District Judge.

3. Both parties failed to completely comply with proper briefing procedures in this case. The government's brief submitted to chambers is on posts, rather than being bound. Neither party submitted the briefs separate from the appendices. Moreover, both parties submitted deposition transcripts *in toto*, without apparent purpose. Only those portions of deposition transcripts necessary to support the briefing assertions should be submitted, with the brief citations directing the court to the appropriate transcript pages. "Necessary portions" means the actual cited pages, as well as any other surrounding pages needed to give the statement(s) proper context. The court expects that counsel will abide by those practices in the future.

4. The relevant facts of this case appear to be undisputed, and consequently, the court will largely refrain from citing to the evidentiary record. The facts are drawn from the parties' briefs, as well as from *Provizer v. Commissioner of Internal Revenue*, 996 F.2d 1216, 1993 WL 245799 (6th Cir. July 7, 1993) (per curiam), which affirmed and incorporated by reference the factual findings of the United States Tax Court in the underlying case by the same name, 63 T.C.M. (CCH) 2531, 1992 WL 56803 (1992). The Tax Court litigation was the "test case" brought by the IRS to determine the legal sufficiency of the tax shelter underlying the instant litigation.

each other for over twenty years, and had many mutual clients. Gordon also possessed an M.B.A., and had at one time been employed by the IRS. He had considerable experience evaluating tax shelters, and formulated opinions regarding tax shelters' economic vitality, the profit motives involved, and the valuation of the product involved. The introduction was made because Mr. Klein had expressed an interest in making an investment that might reduce his financial reliance on Alacon and provide for his retirement.

Gordon first gave Klain a copy of the Offering Memorandum for the investment he had in mind, which was a limited partnership known as Masters Recycling Associates ("Masters"), and the two men discussed it extensively. Masters involved leasing machines designed to recycle styrofoam scrap material into pellets that could be used to manufacture recycled plastic. Subsequently, Mr. Klein met with Gordon and Klain to further discuss the investment opportunity. Gordon arranged for the general partner of Masters, Samuel Winer ("Winer"), to send Mr. Klein an Offering Memorandum. Winer was an investor, investment banker, and consultant who was the general partner in several plastic recycling investment programs. Gordon told Mr. Klein that he had prior dealings with Winer and thought highly of his capabilities; he also though the Masters investment was quite viable.

Mr. Klein met with Gordon four or five times and they discussed the Masters investment extensively, including the favorable tax consequences, which would give Mr. Klein energy and investment tax credits, as well as an equipment depreciation deduction. Gordon also explained to Mr. Klein how his tax basis in the machinery could exceed the actual cash investment because the tax basis would take into account the machines' predicted income producing capability.

Gordon himself had conducted significant investigation into the economic viability of the Masters investment and its potential tax benefits. Those investigations included taking a mechanical engineer to inspect the recycling equipment that was the subject of the investment at the manufacturer's factory; meeting with John Evans ("Evans"), a lawyer whose firm had rendered a comprehensive tax opinion concluding that the touted Masters income tax benefits would likely be achieved; and consulting three to four times a month with George Ferris ("Ferris"), one of his clients who was then vice president of Ford Motor Co. in charge of all basic materials, including oil and plastics, for information regarding expected commodity prices. Ferris consistently told Gordon that the price of oil and its derivative products (like plastic), was likely to continue to increase.

In addition to the tax analysis conducted by Evans' law firm, the Offering Memorandum included the opinions of two evaluators, Dr. Ulanoff and Dr. Burstein, whose opinions confirmed the reasonableness of the equipment price and its technical ability. Dr. Ulanoff was a professor of marketing at Baruch College and was the author of numerous books on technical and marketing subjects. His report covered the marketing value and potential of the recycling machines (also referred to as "recyclers") and expressed the conclusion that their sales price and rental payments were fair and reasonable. He allegedly based his conclusion on his personal observation of the recycling equipment, discussions with company employees, the needs of the plastic industry, and his analysis of the economic outlook for plastic recycling machines. Dr. Burstein was an associate professor of mathematics at New York University who concluded that the recyclers were capable of recycling on a continuous basis. He based that conclusion upon a site visit, discussions with employees, an evaluation of the technical value of the recycler, the recycler's history of performance, and information concerning the use of recycled polyethylene as a raw material. In an opinion letter to Mr. Klein's personal attorney, Richard Polk, Gordon stated that, based on his analysis of the opinions offered by the various professionals with

whom he had consulted, he thought the Masters investment highly likely to turn an economic profit.

Mr. Klein consulted with Polk about the investment, and Polk reviewed the offering memorandum as well as the legal and valuation opinions. Polk believed that in order for the investment to be worthwhile, it had to have economic viability without regard to the tax benefits, and after studying the information and the individuals who recommended the project, Polk concluded that it was a worthwhile investment. He too engaged in extensive discussions with his client, Mr. Klein, about the Master's investment. Polk did not hire outside consultants of any kind to provide second opinions to the opinions provided by Gordon and the Offering Memorandum because he believed that doing so would be too expensive.

The Offering Memorandum contained extensive disclaimers to the effect that there was no guarantee that the business would succeed, and that the IRS might challenge the tax benefits promised to investors, thereby depriving limited partners of those anticipated tax benefits. The disclaimers also specifically told prospective investors that they should rely on their own professional advisors in evaluating the business and tax risks posed by the program. In addition, Gordon, the individual upon whom Mr. Klein and his attorney Polk had relied, received a "finders fee" of $5,000 dollars for obtaining Mr. Klein as an investor. However, in exchange for the fee, Mr. Gordon agreed to represent Mr. Klein free of charge if the IRS challenged the tax benefits—representation that Gordon eventually provided. Both Mr. Klein and his attorney were well aware of the information contained in the disclaimers, and that Mr. Gordon would receive a fee for his part in arranging the transaction, a fee that all concerned thought ordinary.

Klain recommended that Mr. Klein make the Masters investment. Based upon his discussions and study, as well as his business experience and his awareness of the world market for oil, Mr. Klein believed that Masters had good economic prospects and decided to invest in it through EBA in December 1982. As a result, accountant Klain claimed the various deductions and credits on Mr. Klein's 1982 tax return.

At some point in the late 1980s, the IRS determined that Masters was an abusive shelter that had no economic substance and disallowed partnership losses by issuing a notice of final partner administrative adjustment. Masters contested the assessment, and in 1992 the Tax Court ultimately upheld the government's position. Thereafter, the IRS assessed additional taxes, penalties, and interest against Mr. Klein, including the $20,140.60 at issue in the instant case. The government claims that Mr. Klein owes the $20,140.60 for negligence in claiming the Masters deductions and credits on his tax form, while Mr. Klein asserts that his conduct was reasonable under the circumstances.

### III. Summary Judgment Standard

Under Rule 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The existence of some factual dispute does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material.

The burden placed upon the movant for summary judgment is to show that the non-moving party has failed to establish an essential element of its case upon which the non-moving party would bear the ultimate burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548. But

the moving party need not support its motion with affidavits or other similar materials "negating" the opponent's claim. *Id.* at 323, 106 S.Ct. 2548. Once the moving party meets this burden, the burden passes to the non-moving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element necessary to its case with respect to which it bears the burden of proof. *Id.* The non-moving party must show that there is sufficient evidence for a jury to return a verdict in its favor, *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir.1989) (citation omitted), that is, that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant. *Id.* at 1478 (citation omitted). The non-moving party must present affirmative evidence on critical issues. *Id.* at 1477.

## IV. Controlling Law

Title 26 U.S.C. § 6653(a)(1) of the Internal Revenue Code imposes a penalty of five percent of a tax underpayment if any part of the underpayment is due to negligence or intentional disregard of the rules and regulations. Section 6653(a)(2) imposes an additional penalty of fifty percent of the interest payable on the portion of the underpayment attributable to negligence or intentional disregard of the rules and regulations.

 "Tax negligence is 'a lack of due care or a failure to do what a reasonable person would due under the circumstances.'" *Holmes v. Commissioner of Internal Revenue,* 184 F.3d 536, 550 n. 22 (6th Cir.1999), citing *Leuhsler v. Commissioner,* 963 F.2d 907, 910 (6th Cir.1992). "The taxpayer has the burden of proof on the negligence issue." *Pasternak v. Commissioner of Internal Revenue,* 990 F.2d 893, 902 (6th Cir.1993) (internal citation omitted).

## V. Discussion

The legal burden shifting in this case creates an unusual alteration of the ordinary burdens of production. On one hand, the burden is on the government, as the party moving for summary judgment, to show that there is no material issue of disputed fact upon which Mr. Klein might prevail at trial. On the other hand, because this is a tax negligence case, the burden on the merits is for Mr. Klein to demonstrate that he was not negligent. Taken together, this means that the government must affirmatively show that Mr. Klein cannot prove a negative. Put in terms that are, perhaps, more direct, this means that under the evidentiary burdens of this case, Mr. Klein must demonstrate that there is some evidence by which a reasonable trier of fact could conclude that he was not negligent in availing himself of the Masters investment credits and deductions.

 "The finding that the taxpayer failed to meet the burden of proving due care is a finding of fact." *Pasternak,* 990 F.2d at 902. This negligence standard is identical to that under the common law. *See Leuhsler,* 963 F.2d at 910 (citing *Sandvall v. Commissioner,* 898 F.2d 455, 458 (5th Cir.1990) (noting that negligence is evaluated based upon what a "reasonable, prudent" person would do)). However, as with any negligence action, the care that is due, or the "duty," is a question of law to be determined by the court. *See In re: Sealed Case,* 67 F.3d 965, 968 (D.C.Cir. 1995) (citing numerous cases). "The court determines whether the facts give rise to any legal duty on the part of the defendant, and the standard of conduct required of the defendant by his legal duty." *Id.,* citing RESTATEMENT (SECOND) OF TORTS § 328B(b), (c) (1963). "The court should determine the existence of a duty 'by reference to the body of statutes, rules, principles, and precedents'[.]" *Id.,* quoting W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 37 at 236 (5th ed.1984).

Thus, in order for the court to evaluate whether Mr. Klein has met the evidentiary threshold of showing that he might not have been negligent, the court must first know what constitutes negligence under the circumstances. Curiously, the govern-

ment fails to state what the legal duty is under the tax negligence standard. The government points the court to no congressional statutes, nor to any regulations promulgated by the IRS (assuming that the agency is statutorily authorized to do so) that define what might constitute a reasonable standard of care in making an investment that contains allegedly favorable tax consequences for the investor. *See, e.g. Commissioner of Internal Revenue v. Duberstein*, 363 U.S. 278, 290, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960) (Congress has power to set out determinative factors in tax matters). This is not to say that such statutes or regulations do not exist; rather, the court has not been made aware of them.

Nor has the government pointed to any guiding "principles"—from any source—as to how any taxpayer, much less a taxpayer in Mr. Klein's circumstances, ought to behave. Instead, the government largely argues by negative analogy. Relying upon various cases where the imposition of negative tax penalties have been upheld, the government maintains that because particular taxpayers were found to have been negligent, any arguments asserted on their behalf must also be held to be ineffectual. The court finds the government's position unavailing for several interrelated reasons.

**A. Decisions of the Tax Court on Tax Negligence Have No Precedential Authority in an Article III Court**

■ First, the vast majority of cases cited by the government are decisions by the Tax Court. Despite performing exclusively judicial functions akin to those of an Article III federal district court (albeit, solely in the realm of taxation), the Tax Court is an Article I court. *See Freytag v. Commissioner of Internal Revenue*, 501

U.S. 868, 891–92, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991). Tax Court judges lack life tenure; their salaries may be diminished; and they may be removed by the President for cause. *Id.* at 912, 111 S.Ct. 2631 (Scalia, J. concurring). The Tax Court is a classic example of a congressionally created forum within the executive branch designed to adjudicate "public rights." *Samuels, Kramer & Co. v. Commissioner of Internal Revenue*, 930 F.2d 975, 991–92 (2d Cir.1991).[5] "Public rights" are:

> [t]hose rights that arise "between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments."
>
> \* \* \* \* \* \*
>
> The relationship between the government and taxpayer plainly gives rise to public rights and we have no doubt that the resolution of such disputes can be relegated to a non-Article III forum. The "public rights" doctrine rests on the premise that any matters subject to adjudication in Article I forums could have been conclusively determined by the executive or legislative branches in the first instance ... Given the fact intensive nature of tax disputes, resolution of such claims would ordinarily be left to the executive.
>
> \* \* \* \* \* \*
>
> [L]egislative courts, such as the Tax Court, share many of the characteristics of administrative agencies. We believe that the work performed by legislative courts and adjudicatory agencies cannot be distinguished. Both are bodies creat-

---

5. *Samuels* involved a dispute over the statutory authorization for, and constitutionality of, the appointment of special trial judges by the Chief Judge of the United States Tax Court. The constitutional issue centered around whether the Chief Judge could appoint special trial judges under the "Appointments Clause" of Article II. The *Samuels* court concluded that the appointment was neither statutorily nor constitutionally infirm, a conclusion ulti-

mately upheld by the Supreme Court in *Freytag*. Unlike the *Samuels* court, however, a closely divided Supreme Court determined that a Chief Judge was a "Court of Law" rather that a "Head of Department" for purposes of the Appointments Clause. Notwithstanding the overruling on that distinct issue, the *Samuels* court's exposition on the distinction between Article I and Article III courts remains good law.

ed by Congress under Article I to adjudicate federal rights and both lack the requisites of Article III status. From the perspective of Article III, there is no difference in constitutional principle between legislative courts and administrative agencies ... Despite several differences in both appearance and operation, their work cannot be functionally or theoretically distinguished.

*Samuels,* 930 F.2d at 992–93 (extensive internal citations and quotations omitted). Although the Tax Court undoubtedly performs adjudicatory functions and maintains many of the traditional indicia of the judiciary, *see Freytag,* 501 U.S. 868, 111 S.Ct. 2631, 115 L.Ed.2d 764, its members do not receive the salary and tenure protections of Article III. *See Samuels,* 930 F.2d at 993; *c.f. Landry v. Federal Deposit Ins. Corp.,* 204 F.3d 1125, 1131–32 (D.C.Cir.2000) (publication pending) (when challenging adjudicatory authority of non-Article III court, "assumption that inadequate tenure may prejudice the challenger is so automatic that it usually goes unmentioned") (internal citations omitted).

 Though the negligence penalty is undoubtedly a "public right" susceptible to adjudication in an Article I court, the only proffered legal definition (by either the government here or in case law) of when liability thereunder may accrue is by reference to its private right cognate; i.e., what a reasonable person's duty is under the circumstances. *C.f. Billing v. Ravin, Greenberg & Zackin, P.A.,* 22 F.3d 1242, 1246 (3rd Cir.1994) (tortious negligence is private rather than public right). Private rights such as those brought in tort are traditional common law claims reserved for Article III courts. *See Ben Cooper, Inc. v. Insurance Co. of the State of Pennsylvania,* 896 F.2d 1394, 1398 (2d Cir.1990) (citing *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 71, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982)). This is not to say that Article I courts cannot consider matters related to private rights; it is to say, however, that to the extent private rights are implicated, Article III courts must have the final word in defining what the law is:

> Article III requires only that the ultimate "judicial power" be reserved in the Article III courts; it does not require that all adjudicative bodies exercising the review "standards" that Article III courts exercise be constituted in Article III courts.

*Kalaris v. Donovan,* 697 F.2d 376, 387 (D.C.Cir.1983). An Article I court is free to adjudicate even private law claims, so long as an Article III court can "freely and independently" exercise "the essential attributes of the judicial power," including, ultimately, judicial review. *See Kalaris,* 697 F.2d at 387 n. 41 (citing *Northern Pipeline,* 458 U.S. at 86 n. 39, 102 S.Ct. 2858 (Brennan, J. writing plurality opinion) and 458 U.S. at 91–92, 102 S.Ct. 2858 (Rehnquist, J. concurring)).

 "As the Supreme Court has recognized, a concise and direct analysis of the issue surrounding the distinctions between Article III and Article I courts is extremely difficult because this area of constitutional law is plagued by 'frequently arcane distinctions and confusing precedents.'" *Samuels,* 930 F.2d at 988 n. 10 (citing *Northern Pipeline,* 458 U.S. at 90, 102 S.Ct. 2858 (Rehnquist, J. concurring)). In this instance, however, there appear to be no congressionally mandated guidelines that define tax negligence. Nor do there appear to be any regulations promulgated by the enforcing agency (the IRS) that might define that public right. And the government does not refer this court to any Article III court precedents that might further shape or define the public right of tax negligence in any particular way. Instead, in this circuit at least, the public right as a matter of law is defined solely by its private right cognate, negligence. *See, e.g. Leuhsler,* 963 F.2d at 910. While Article I legislative courts have their place in our constitutional structure, at the end of the day, "it is emphatically the province and duty of the *judicial department* to say what the law is." *Marbury v.*

*Madison*, 1 Cranch 137, 177, 5 U.S. 137, 2 L.Ed. 60 (1803) (emphasis added). As previously set forth, "the judicial department" is defined as Article III courts. Hence, while the Tax Court's opinions on the subject of tax negligence may be illustrative, they have no precedential value in law, and are due no deference by the court.

## B. Mere Affirmation of Tax Court Decisions on Appeal Does Not Create Biding Legal Precedent

 Decisions of the Tax Court are reviewed on appeal by the federal courts of appeal. *See* 26 U.S.C. § 7482. The statutorily-established appellate review standards for Tax Court decisions comport with the previously discussed constitutional concerns. Factual determinations by the Tax Court are accorded a high level of deference on appellate review, and are to be reversed only upon a finding of clear error. *See Holmes v. Commissioner of Internal Revenue,* 184 F.3d 536, 543 (6th Cir.1999) (internal citations omitted). By contrast, "the Tax Court's application of legal standards and its legal conclusions, are reviewed de novo." *Id.* Both standards of review were established by Congress in 26 U.S.C. § 7482(a), which requires the courts of appeals to review Tax Court decisions "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." *See Freytag,* 501 U.S. at 891, 111 S.Ct. 2631.[6]

 As the Supreme Court observed in *Commissioner of Internal Revenue v. Duberstein,* 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), the facts and factual inferences involved in determining an individual's tax status are highly particularized, and must be analyzed on a case-by-case basis. *Id.* at 289–91, 80 S.Ct. 1190. But as the court also observed, the facts cannot stand by themselves; there must be an articulated legal standard by which the reviewing court can analyze the proceedings below. *Id.,* at 292, 80 S.Ct. 1190. After *Duberstein* was announced, the Sixth Circuit provided further elaboration of what *Duberstein* required of appellate review:

> When it comes to conclusions of law and inferences to be drawn therefrom, the appellate court is free to act independently and draw its own legal conclusions and inferences. If this were not so, the appellate court would be stripped of its power of review. Moreover, not all findings labeled as findings of fact are binding on an appellate court. Where a finding designated as a finding of fact is not in reality a finding of fact, but is a conclusion of law or a mixed finding of fact and conclusion of law, it is not binding on the appellate court. Where a finding is of an ultimate fact in the making of which is involved the application of legal principles, it is subject to review.

*Cordovan Assoc., Inc. v. Dayton Rubber Co.,* 290 F.2d 858, 859–60 (6th Cir.1961) (internal citations omitted).

In the instant case, the government relies on *Provizer v. Commissioner of Internal Revenue* (which involved another plastics recycling tax shelter), an unpublished Sixth Circuit opinion, for the proposition (among other things) that Mr. Klein is "foreclosed" "from claiming that [he] reasonably relied upon disinterested advisors" by making inquiries of and through Gor-

---

6. Reading § 7482(a) in conjunction with *Freytag*'s observation that the Tax Court functionally resembles the federal district courts, one might be tempted to conclude that the Tax Court's interpretation of private rights should be accorded at the same deference as those of the district courts, contrary to this court's conclusion in part V.A. Such a conclusion would be incorrect. First, congressional statutes do not—and cannot—alter the constitutionally confined judicial power. Second, *Freytag* did not even purport to reverse the fundamental holding in *Northern Pipeline* that Article III courts must be the final arbiters of private rights. Even assuming, *arguendo,* that such an argument was given its full force, it would only mean that Tax Court decisions would be on parity with those of the district courts, with no binding effect on other courts except as to res judicata and collateral estoppel.

don, who was receiving commissions for each investor he successfully brought into the program. For several reasons, however, *Provizer* is too slender a reed upon which the government may comfortably rely.[7]

First, *Provizer* is an unpublished decision. The precedential weight of the Sixth Circuit's unpublished decisions has been established by that court:

> **Citation of Unpublished Decisions.** Citation of unpublished decisions in briefs and oral arguments in this Court and in the district courts is disfavored, except for the purpose of establishing res judicata, estoppel, or the law of the case. If a party believes, nevertheless, that an unpublished disposition has precedential value in relation to a material issue in a case, and that there is no published opinion that would serve as well, such decision may be cited if that party serves a copy thereon on all other parties in the case and on this Court. Such service shall be accompanied by including a copy of the decision in an addendum to the brief.

6 Cir.R. 28(g). Because of the government's significant reliance on *Provizer*, the *Provizer* court's tax negligence discussion will be reproduced here in its entirety:

> The Provizers next contend that the Tax Court erred in assessing a penalty for negligent underpayment of taxes pursuant to § 6653(a) of the Code. 26 U.S.C. § 6653(a) (1982). Our review of the record, however, convinces us that the Tax Court correctly assessed the negligence penalty against the Provizers.

*Provizer,* 1993 WL 245799 at *3. The Court of Appeals opinion nowhere contains any mention of Mr. Klein, Gordon, or of any other principal participant in the instant case. Indeed, Mr. Klein was not a party to the underlying *Provizer* case in the Tax Court, so there can be no res judicata, estoppel, or law of the case effect of that proceeding upon him. Nor does the government argue that there is.

Instead, the government argues that the Sixth Circuit's unpublished *Provizer* decision is the best precedent in this circuit on the issue of tax negligence in the context of plastic recycling investments from the early 1980s. The government's interest in *Provizer* is understandable. This court's own review of Sixth Circuit jurisprudence in the area of tax negligence finds very little on the topic, either published or unpublished. The majority of cases appear to review the underlying decisions only under a standard of clearly erroneous/clear error, indicating that the Court of Appeals was reviewing only the factual record, and not the legal predicates.

The *Provizer* court did conduct both a factual and legal review of the Tax Court's decision, *see id.* at 1993 WL 245799 at *1; however, as the aforementioned quotation of the court's comment on the tax negligence penalty demonstrates, there is no explanation beyond a simple affirmation of the lower court's holding. There is no discussion of what constitutes tax negligence as a legal matter, and there is no holding mandating that the existence of certain facts relating to the plastic recycling investments at issue here results in a

---

7. Mr. Klein asserts that this court should give little credence to the Tax Court's decision in *Provizer* because it was written by a Special Trial Judge, who is akin to a federal magistrate judge, and who Mr. Klein alleges has issued "approximately 25 virtually identically-worded opinions" imposing negligence penalties on some 50 individuals for investments similar to that at issue here, "despite their reliance on various forms of professional advice." The argument is not well-taken. Like a federal magistrate judge's report and recommendation to the district court, a Special Trial Judge's proposed findings and opinion

become those of the Tax Court once adopted by the presiding Tax Court judge. *See Freytag,* 501 U.S. at 873, 111 S.Ct. 2631 citing 26 U.S.C. § 7443A(b)(4). As such, they are entitled to the same respect as any other decision of that court, as are the jurists who try such cases. The federal judicial system is designed to provide individualized justice, and this court will consider only the merits of the case before it. If other litigants in other cases before the Tax Court are dissatisfied with the outcomes obtained there, they are free to avail themselves of the appropriate reconsideration and appellate procedures.

conclusion that negligence occurred. However, the government argues that by affirming the Tax Court's decision, the Sixth Circuit endorsed the Tax Court's analysis, and that subsequent cases are bound by that determination.

While the simplicity of the government's argument is fetching, it puts more stock in the results of the appellate process than the process is intended to produce. Putting aside for a moment the Court of Appeals' own presumption that its unpublished opinions have limited precedential value, see 6 Cir.R. 28(g), the fact of the matter is that appellate courts review judgments, not opinions. *See Bowen v. American Hosp. Ass'n,* 476 U.S. 610, 626 n. 11, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); *United States v. Accra Pac, Inc.,* 173 F.3d 630, 632 (7th Cir.1999) (Easterbrook, J.).[8] An affirmation of the proceedings below is an affirmation of the result, not the content, of a trial court's decision. Appellate courts are well aware of the controlling guidance that their opinions provide for future cases; indeed, that is the primary reason for having opinions at all. If appellate courts wish a particular decision to have that effect, they will publish an opinion explaining why under certain circumstances the law requires a certain result. But the mere affirmation of a lower court's decision by no means converts the subordinate court's decision into that of the superior's. Hence, while affirmed lower court opinions may be illustrative, or even persuasive, they are not precedential.

Somewhat more persuasive is the government's reliance on *Addington v. Commissioner of Internal Revenue,* 205 F.3d 54 (2d Cir.2000) (publication pending), for the proposition that "it is unreasonable for a taxpayer to rely on [the] advice of someone who they [sic] know has a conflict of interest."[9] *Id.* at 205 F.3d 54, 2000 WL 224380 at *4. The quotation has the ring of legal authority, and while decisions of the Second Circuit are not binding on this court, they are certainly due deference in the absence of Sixth Circuit authority on the subject. But a closer examination of *Addington* reveals that it was a review conducted solely under the "clearly erroneous" standard. *See id.* at 205 F.3d 54, 2000 WL 224380 at *3. In other words, the Second Circuit examined the record of the Tax Court's proceedings only to determine if the Tax Court's conclusion had sufficient factual support. By the terms of its standard of review, the Second Circuit did not purport to be establishing legal precedent in that case. And as will be discussed in Part V.C. of this opinion, this court finds the quoted assertion to be too sweeping and categorical to be relied upon for summary judgment purposes. Whatever the merits of determinations by the Tax Court (or, for that matter, by the district courts) in individual cases, mere

8. In *Accra Pac,* Judge Easterbrook explained why appellate courts distinguish between lower court judgments and opinions:

> Someone who seeks an alteration in the language of the opinion but not the judgment may not appeal ... Reluctance to review language divorced from results has a sound footing in the statutory requirement of an adverse effect—not to mention the constitutional requirement of a "case or controversy"—and has practical support too. Few victors in litigation or the administrative process are thrilled with the opinion; almost everyone perceives that different language could have produced benefits—perhaps ammunition for some future dispute (a particular concern of institutional litigants and those involved in long-running disputes), perhaps psychic gratification. It is work enough to resolve claims made by losers; review of claims made by winners could double the caseload, and to what end? Judicial time devoted to what may be a litigant's will-o'-the-wisp is time unavailable to resolve other, more concrete disputes. No wonder appellate courts do not issue Writs of Erasure to change language in district judge's opinions, when the judgments are uncontested.

> *Id.* at 632.

9. The government notified the court of this recent case by motion on March 21, 2000.

affirmation by appellate courts of those decisions is without precedential value. Binding appellate court decisions are those that assert clear legal principles (or, in some cases, factual findings) that are intended to have force beyond the facts of the specific case presented. The government has not directed this court's attention to such decisions in support of its arguments in this case, and this court has been unable to find any such precedents in this circuit. Accordingly, there appears to be little, if any, decisional support for the government's motion for summary judgment.

## C. The Individual Circumstances of Mr. Klein's Case Could Support a Finding that He was Not Negligent

■ Because the court finds the government's proffered cases to be of little or no weight, it turns to the facts at hand. "The inquiry into a taxpayer's negligence is highly individualized, and turns on *all of the surrounding circumstances* [,] including the taxpayer's education, intellect, and sophistication." *Merino v. Commissioner of Internal Revenue*, 196 F.3d 147, 154 (3rd Cir.1999) (emphasis added). This court's reading of Sixth Circuit cases reviewing the imposition of tax negligence penalties confirms that the appropriateness of such penalties is a very fact-specific determination in most circumstances. Accordingly, the inquiry here must be whether Mr. Klein's proffered reasons for his conduct create a reasonable possibility that a trier of fact could find that he was not negligent in making the Masters investment; put another way, the question at summary judgment is whether the government can completely discount those reasons.

As an initial matter, it is worth noting that the Supreme Court has held that:
When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try and monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking advice in the first place. "Ordinary business care and prudence" do not demand such actions.

*United States v. Boyle*, 469 U.S. 241, 251, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985). The *Boyle* opinion is also informative for what it does not say. It does not *require* that a taxpayer consult with an attorney or accountant in order to be found not negligent. Nor does it set any requirements for the kind of relationship a taxpayer must have with his lawyer or accountant, or any limitations as to the extent of interest such advisors may have with the (potentially) taxed subjects matter(s). Moreover, *Boyle* says nothing to the effect that a tax advisor must be an expert in those underlying subjects, except that such professional advisors should be knowledgeable about their tax consequences.

No doubt, such factors may be accorded great weight in determining whether an individual taxpayer was reasonable under the circumstances. But there is a huge difference between giving evidence weight and giving it dispositive effect. Contrary to the suggestions in the government's briefs, this court is unable to find any binding legal authority for giving *carte blanche* effect to such assertions that could support a motion for summary judgment.

■ For instance, it is certainly relevant to a tax negligence determination that an investment advisor was not disinterested. *See, e.g. Pasternak*, 990 F.2d at 903; *Leuhsler*, 963 F.2d at 910.[10] Mr. Klein

10. Contrary to the government's implication, neither *Pasternak* nor *Leuhsler* stands for the general proposition that "a taxpayer may not rely upon" the advice of interested individuals; the cases merely noted that the individuals relied upon in those cases were not disinterested, and upheld the Tax Court's fact-specific determination that reliance in those particular circumstances was unreasonable.

concedes that he relied upon Gordon's representations "in large part" in deciding to make the Masters investment. And there can be no reasonable claim in this case that Gordon was a completely disinterested advisor; although he may, as Mr. Klein contends, have provided extensive legal services in return for the fee paid, the fact remains that Gordon's receipt of the fee was contingent upon him recruiting Mr. Klein to be a Masters investor. That fact might well militate against the reasonability of Mr. Klein's reliance on Gordon's representations, perhaps even overwhelmingly. But there are other factors that weigh in Mr. Klein's favor that might lead a trier of fact to conclude that his reliance upon Gordon was reasonable. For example, Gordon came highly recommended by Klain,[11] Mr. Klein's long-time trusted friend and accountant. Gordon had extensive experience in the area of tax shelter investments, including a stint with the IRS, and possessed an M.B.A. Not to be forgotten is the fact that Gordon was a tax attorney, who was presumably well aware of his ethical and fiduciary responsibilities in dispensing advice about the legal conse-quences of the tax investments he was explaining.[12] It would not have been unreasonable for Mr. Klein to assume that Gordon would abide by his professional obligations. And there is ample evidence that Gordon himself conducted extensive investigations into the viability of the Masters investment program. Though Gordon may well have been a less than completely disinterested advisor, the government has not shown that that fact alone rendered Mr. Klein's reliance unreasonable, and Mr. Klein has proffered ample evidence on the reasonability of his reliance on other's advice to survive summary judgment.[13]

The government also contends that Mr. Klein's reliance upon Klain and Polk was unreasonable because neither individual "possessed any first hand knowledge of the transaction or had the requisite expertise in the recycling or the plastics industry to permit an evaluation of the merits of the transaction." The courts of appeals are split on the issue of whether it is reasonable for a taxpayer to rely on an advisor who lacks knowledge about the industry in which the taxpayer is investing. Compare, e.g. Goldman v. Commissioner of Internal

**11.** Klain is now deceased, and his testimony regarding his actions with Mr. Klein on the tax feasibility of the Masters investment was apparently not preserved by either party. Though neither party gave significant discussion in briefing to the issue of the admissibility of Klain's hearsay statements, it appears likely that other witnesses could testify to what Klain purportedly told them for the purpose of establishing Mr. Klein's then state of mind under FRE 803(3), because Mr. Klein's state of mind is at issue in determining whether he was acting reasonably in 1982. It is also possible (though undeterminable without further information), that Klain's statements would be admissible under FRE 807. In any event, it appears that the statements attributed to Klain are similar to those that will be offered through other witnesses and documents. While Klain is certainly an important witness in this case, his unavailability does not appear to be crucial to any particular issue raised by either side. And so long as there is other evidence available as to those issues, the absence of Klain's testimony is not dispositive. See, e.g. Streber v. Commissioner of Internal Revenue, 138 F.3d 216, 221–22 (5th Cir.1998) (fact that tax attorney who ren-dered advice whose result was ultimately challenged by IRS was not required to testify where other witnesses could testify that taxpayers acted in accordance with his advice).

**12.** The court takes judicial notice that it is becoming increasingly common for attorneys to invest in their client's businesses or in other matters of concern to those clients. Though the ethical feasibility and regulation of doing so varies by jurisdiction, the general rule is that full disclosure of an attorney's pertinent interests to the client will preserve the presumption that the attorney will provide complete and impartial advice, so long as the client gives informed consent. Mr. Klein alleges precisely that scenario here, and the government does not dispute it.

**13.** Though apparently not presented in the instant case, it is entirely conceivable that an individual with a vested interest in the topic of discussion (such as a fellow investor) might be more diligent in examining its potential consequences than a "disinterested" individual who will bear no consequence if the investment or tax decision eventually turns for the worse.

*Revenue,* 39 F.3d 402, 408 (2d Cir.1994) (specifically upholding under the clearly erroneous standard the Tax Court's determination that such reliance is not reasonable); *Anderson v. Commissioner of Internal Revenue,* 62 F.3d 1266, 1271 (10th Cir.1995) ("one does not have to be an expert in an industry before he can invest in the industry . . . or recommend an investment to another").

■■■ For two major reasons, this court finds that taxpayer reliance upon an advisor who lacks knowledge about the subject industry is not *per se* unreasonable. To begin, as the Second Circuit explained in *Addington,* and as confirmed by this court's review of the cases, those courts that have held that tax advisors must have expertise in the underlying investment have done so by drawing a negative inference from the Supreme Court's holding in *Boyle* that reasonable reliance upon a professional tax advisor demonstrates that a taxpayer was not negligent. *See, e.g. Addington,* 205 F.3d 54, 57–58 That view is unpersuasive for at least three reasons. First, as a general matter, drawing legal rules by negative implication from a single case holding, as opposed to a comprehensive statutory scheme, is an inherently suspect endeavor. *See, e.g. Martin v. Hadix,* 527 U.S. 343, 119 S.Ct. 1998, 2006, 144 L.Ed.2d 347 (1999); *Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 28, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997); *see also National Fed'n of Fed. Employees, Local 1309 v. Department of the Interior,* 526 U.S. 86, 96, 119 S.Ct. 1003, 143 L.Ed.2d 171 (1999); *United States v. Williams,* 15 F.3d 1356, 1363 (6th Cir.1994).

Second, by its terms, the *Boyle* court discussed only accountants and attorneys who were providing advise about "a matter of tax law, such as whether a liability exists." *Id.* at 251. *Boyle* says nothing, even by implication, about substantive investment advice. Investment advice is distinct from tax advice, and this court is unaware of analysis by any court explain-

ing why *Boyle* requires the two subjects to be conflated.

Third, an absolute requirement that investors obtain advisors expert in the subject areas of the potential investments in order to protect themselves from future tax penalties would undermine the investment process in a free market economy. Ordinarily, those who attempt to convince others to give them money for investment purposes assume the burden of persuading those investors that there will likely be future profitable returns. Investors evaluate the information presented, and then attempt to make an educated guess as to the likelihood of such returns. That choice is inherently risky; investors may be ultimately rewarded with profits, or they may lose their entire investment. But it is the free flow of capital that permits investments to be made at all. Requiring, as the government suggests, that each investor in effect "re-invent the wheel" and hire his own experts to evaluate the substantive merits of every potential investment would create an onerous burden that would greatly discourage the free flow of capital. Moreover, if an investor chooses to invest in the latest advances or ideas, areas which may offer the most fruitful rewards, an expert may be too onerous—or even impossible—to obtain. Absent any statute or regulation suggesting such an extraordinary requirement, the court will not impose one here.

■■■ For another reason as well, this court declines to adopt a *per se* rule that investors must seek the advice of completely disinterested experts in the subject matter of the investment in order to avoid future tax negligence penalties. Such a rule defies ordinary taxpayer experience. Although the two can be interrelated (sometimes intimately), the decision to make an investment is legally and analytically distinct from the decision as to what tax consequences one will assert as a result of that investment. It is undoubtedly true that Mr. Klein relied primarily on Gordon for advice on the economic merits

of the Masters investment, either directly or vicariously through Klain and Polk's evaluation of the information Gordon supplied. As indicated earlier, there is nothing inherently wrong with relying on the advice of a promoter when evaluating an investment. In a tax negligence case, the question is whether one reasonably relies on professional advice in claiming tax benefits based upon those investments. Mr. Klein has presented plausible evidence that both Klain and Polk told him that he could claim the tax credits and equipment depreciation on his return, provided that the underlying investment was economically sound. The government asserts that Klain and Polk's reliance on that assumption could not have been reasonable because that assumption was based on information provided by the promoter, Gordon.

The government errs because it depends upon a *non sequitur*: that is, the government claims that because the Masters investment program was ultimately an economic failure and determined to be an unlawful tax shelter, its investors must have been negligent in evaluating its tax consequences. The assertion is both illogical and irrelevant. Even the most diligent and inquisitive investor can lose his investment wholesale; investments are inherently risky, and even the best investments may turn sour through no fault of the investor. And the complexity of the tax code, along with the economic transactions upon which it depends, often cause tax experts to err or misjudge how those transactions will ultimately be characterized by the IRS. Indeed, as many court decisions have demonstrated, even the government's after-the-fact analysis and imposition of tax penalties may be wrong. *See, e.g., generally Streber*, 138 F.3d 216, 219–21. The converse is also equally possible: a taxpayer can be grossly negligent in evaluating the economic feasibility of an investment and its tax consequences, and still fortuitously make a profit and pay the government its due.

Mr. Klein contends that he reasonably relied on the advice of his accountant, Klain, and his tax attorney, Polk, in deciding to claim the tax benefits from the Masters investment on his personal return. He has presented plausible evidence that he had no reason to doubt their advice as to the tax consequences, and to the extent the government disputes either the reasonableness of his actions or his sincerity, those are issues of fact and credibility that must be left for trial. Nor does the government offer any support for its claim that one cannot rely on the free advice of friends who are experts in the field upon which they counsel. Even more so than the previous discussion of disinterestedness, this assertion is counter-intuitive. Most people are apt to rely on the advice of those they have come to know and trust through experience, whether paid or not, than they are on that of a stranger. Moreover, it is unclear why "payment" changes the legal nature of advice; the government's logic would presumably destroy, for example, any incentive for taxpayers to avail themselves of *pro bono* services offered by tax attorneys and accountants when filing returns. While issues such as friendship, payment, and interestedness may all be relevant to factual determinations of credibility and reliability, they do not lend themselves to absolute strictures in the tax negligence context.

In essence, the government is attempting to get a third bite at Mr. Klein's taxpaying apple purely on the basis of having gotten the first two. The first bite was the repayment of the back taxes with interest, which made the government whole. The second was the late penalties, which were based on Mr. Klein's failure to timely pay the amounts due, and were intended to deter him and others from making similar mistakes in the future, and possibly, to compensate the government for the burden of ascertaining and collecting the past due amount. But the third bite requires a different quantum of evidence than the first two. The first two, respectively, require the government prove only that (1) a certain income and tax status existed, and that, *ergo*, it is entitled to a given portion of that income; and (2)

the owed amount was not timely paid. But the tax negligence penalty requires a different set of proofs, namely, that a taxpayer did not act as a reasonable person would act under the circumstances at the time the taxes were paid or should have been paid. In other words, it is quite possible for a taxpayer to be ultimately wrong about his tax obligations to the government without having been negligent. *See, e.g. Streber,* 138 F.3d at 221 n. 10; *Durrett v. Commissioner of Internal Revenue,* 71 F.3d 515, 517–18 (5th Cir. 1996). Hence, where a taxpayer presents evidence that he may have acted with reasonable care in determining the tax consequences of his investments, the government cannot dispel that proffer simply by demonstrating that the taxpayer in the end was adjudged to be liable. The relevant evidence in a tax negligence case consists of determining what the taxpayer did at the time of asserting the tax status in question, and why he did it.

 In a similar vein, the government argues that the "extraordinary tax benefits" present in the Masters Offering Memorandum (which the government characterizes as a nearly 200% return within four months without personal exposure), in tandem with the explicit and lengthy disclaimers (that the investment was not guaranteed to succeed, that investors should seek independent professional advice on its merits, and that the IRS might challenge its asserted tax benefits), should have put Mr. Klein on notice that the Masters investment was "too good to be true." The court finds these arguments also unavailing.

Turning to the second issue first, such disclaimers are par for the course in investing. Indeed, Mr. Klein suggests (and the government does not dispute) that such disclaimers may be required under the federal securities laws. Even if they are not required by law, such disclaimers may serve the useful purpose of informing unsophisticated investors of the truism that where investments and the tax code are concerned, there are no guarantees.

But for a presumably experienced and sophisticated investor such as Mr. Klein, such disclaimers would be no more than an iteration of the obvious. Mr. Klein does not dispute that the disclaimers were there, that he read them, or that he acted in accordance with them. Once again, the relevant evidence concerns what exactly Mr. Klein did to ensure that he met his federal tax obligations. Where the actions of an experienced businessman like Mr. Klein are concerned, such warnings are likely immaterial in evaluating his reasonableness, as he would be probably presumed to know the risks even in their absence.

The government's suggestion that the high rate of return from the tax benefits in the investment should have put Mr. Klein on notice is also unpersuasive in the summary judgment context. It may well be, as the government suggests, that seemingly fantastic tax benefits, coupled with "extensive continuing press coverage of [ ] questionable tax shelter plans" should have put a reasonable taxpayer on notice that something was amiss. But it may also well be, as Mr. Klein posits, and as even the Tax Court has recognized, that "investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970s and early 1980s to invest in [energy-saving] technology." *See Krause v. Commissioner of Internal Revenue,* 99 T.C. 132, 177, 1992 WL 178601 (1992). It is Mr. Klein's testimony, and that of others associated with his Masters investment decision, that the "energy crisis" of the era did influence his decision to make that investment. And that, presumably, is precisely what Congress intended by enacting energy tax credits in that era—to shift the flow of investment capital into endeavors that might decrease the nation's dependance on foreign oil.

In sum, the court finds the government's sweeping arguments unavailing under the facts of this case as presented thus far. Its briefs suggest two contradictory streams of thought. First, that investments made on the basis of tax con-

sequences are inherently suspect, and if unsuccessful, automatically warrant negligence penalties. Second, that when making investments, investors are obligated to plumb the depths of both the investments and all of their potential tax consequences, or they will otherwise be liable for tax negligence. Not only can the government not have it both ways, but neither extreme reflects what reasonable investors and taxpayers do. The tax code, in all its ineffable complexity, is a fact of investment life. Congress creates the code's contents for innumerable, and oftentimes, indiscernible reasons. One reason may be to reward or punish certain groups or activities. Another may be to curry favor. Or, it may be to remedy perceived inefficiencies or inadequacies in the market, or to improve the social welfare. The list of motivations and means is potentially endless.

Investors and taxpayers respond to these incentives in ways both intended and unforseen. They may make investments because of extraordinarily favorable tax consequences, such as by purchasing a home to avail themselves of a home mortgage deduction, instead of investing their money in another economic transaction with a higher market return. Or some individuals may be able to obtain extraordinary tax benefits out of all proportion to the economic worth of their endeavors in order to facilitate a congressionally-recognized social purpose, such as providing the Earned Income Tax Credit to the working poor. And one can even reasonably invest in a transaction that has no profit-motive at all, purely for the tax consequences, without being negligent in doing so. *See, e.g. Chamberlain v. Commissioner of Internal Revenue,* 66 F.3d 729, 733 n. 23 (5th Cir.1995). That is the nature of the beast.

The incentives that purportedly motivated Mr. Klein, though perhaps more obscure, are no different. He claims that he made investments, at least in part, because

of a tax code that encouraged him to do so. For that alone, he cannot be faulted. Congress was attempting to alter investment behavior in the late 1970s and early 1980s by providing incentives through the tax code, and Mr. Klein has presented plausible evidence that he responded to those incentives. Responding to such incentives does not raise even the slightest hint of negligence; nor does the fact that the tax code permits some transactions to be structured in such a way as to be quite lucrative. Put another way, if the Masters investment had turned out to be economically viable,[14] and Mr. Klein was enjoying the same favorable tax consequences as those for which the government pursues him here, the government would not be accusing him of negligence. It is not the favorability of the tax scheme that raises the specter of negligence—that is within Congress' purview—but whether the taxpaying investor reasonably evaluated whether the claimed tax benefits applied to the investment in question.

The government raises several arguments on that point (mostly in its reply brief), but this court will spend little time analyzing them here because they are conclusions based on factual inferences that cannot support a motion for summary judgment. For instance, the government argues that Mr. Klein "failed to understand the [Masters] transaction," which is evidenced by the fact that he engaged in a "slew of communications" to ascertain whether the investment was proceeding as promised. That is one possible interpretation of Mr. Klein's actions, but by no means the only one. He may, for example, have been an attentive and diligent investor who was concerned about where his money was going. Similarly, the government argues that Mr. Klein's monitoring of the investment proves that he was seeking to "insulate himself from exposure when the IRS challenged the investment." Though it would seem that such behavior

**14.** As discussed, the court does not find that the government has demonstrated that the Masters investment was doomed from it beginning, or that such doom should have been

obvious to any reasonable and prudent investor/taxpayer. Were that the case, the court's analysis in this case might well be different.

would be entirely rational (and the opposite of negligence), what the government describes is the glass half-empty version; the half-full version might be that Mr. Klein was constantly monitoring his investment in order to ascertain exactly what his tax obligations were, and whether he needed to revise his earlier assessment. When the same facts can lead to different reasonable conclusions, summary judgment cannot be granted.

## VI. Conclusion

The parties have presented a substantial set of facts about a series of decisions that occurred nearly twenty years ago. At this stage of the litigation, there appear to be several ways of interpreting the facts presented—some innocent, some not. The one thing that does appear clear is that both Mr. Klein and the IRS are revenue maximizers. Each is attempting, within the context of the civil tax code, to obtain as much money as possible at the expense of the other. To date, Mr. Klein appears to have been on the losing end of that struggle.

The government contends that it is due still more. It claims that Mr. Klein did not act reasonably in claiming certain tax benefits in 1982, and that he must pay a negligence penalty for doing so. And the government has assembled evidence that could plausibly support its contention.

But the facts viewed as a whole do not necessarily lead to the government's conclusion. Summary judgment is appropriate only where the facts presented can reasonably lead to only one legal conclusion. It is beyond cavil that every citizen has a legal obligation to see that the government gets the taxes it is lawfully due. Unfortunately for both the parties and the court, there is precious little law describing what a taxpayer must do for his conduct to be deemed reasonable. Congress, and perhaps the IRS, could enact or promulgate statutes or regulations that would tend to define the nature of that obligation in more concrete terms. But they have not, and the courts are forced to conduct a case-by-case, individualized analysis of the taxpayer's actions. *See Merino,* 196 F.3d at 154.

There may, on occasion, be factual circumstances that lead almost inexorably to a conclusion that a taxpayer was negligent. *See, e.g. Holmes,* 184 F.3d at 549–50 (placing personal expenses in records of business expenses); *Harris v. Commissioner of Internal Revenue,* 745 F.2d 378, 380 (6th Cir.1984) (failure to keep contemporaneous records of matters claimed as tax benefits). However, that a taxpayer may ultimately turn out to have been mistaken or lacked prescience does not mean that he was negligent. In the absence of articulated and binding legal standards, tax negligence cases do not generally lend themselves to summary judgment.

Indeed, as virtually all of the cases cited by the government (as well as this court's own research in this circuit) demonstrate, in virtually all tax negligence cases, the taxpayer gets the benefit of a trial in which the court will consider the facts of his case. *See Duberstein,* 363 U.S. at 290, 80 S.Ct. 1190. It is true that the burden is upon the taxpayer to prove that he was not negligent. Mr. Klein has presented facts in response to the government's summary judgment motion that could lead a trier of fact to find that he acted reasonably in claiming certain tax benefits from the Masters investment in 1982. The government's arguments have not dispelled his claims by demonstrating that Mr. Klein's actions were unreasonable as a matter of law. The underlying facts of this case do not appear to be disputed; the disputed issues in this case turn largely on inferences, motives, reliability, and credibility. The government may yet be able to prove that Mr. Klein was unreasonable as a matter of fact. But that question must be left for trial. Accordingly,

IT IS ORDERED that defendant's "Motion for Summary Judgement" is DENIED.